Qusair Mohamedbhai
Iris Halpern*
Azra Taslimi*
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street
Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
qm@rmlawyers.com
ih@rmlawyers.com
at@rmlawyers.com
*Attorneys for Plaintiff*

*\* Pro Hac Vice Application Pending*

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| TERRI LESLEY, an individual, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| Defendant, | ) | |
| | ) | |
| HUGH BENNETT, | | |
| SUSAN BENNETT, AND | | |
| KEVIN BENNETT, | ) | |
| in their individual capacity. | ) | |

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Terri Lesley, by and through her attorneys Qusair Mohamedbhai, Iris Halpern, and Azra Taslimi of RATHOD | MOHAMEDBHAI LLC, hereby alleges as follows:

**<u>INTRODUCTION</u>**

For twenty-seven years, Plaintiff Terri Lesley dedicated her life to Campbell County Public Library System (hereinafter "CCPLS" or "library system"). She was an extraordinary librarian, having served eleven of those twenty-seven years as the CCPLS Executive Director, transforming it into a thriving hub of knowledge and community engagement. In 2021, however, the highly politicized vilification of LGBTQ+ communities and book-banning craze engulfing the country landed on her doorstep, with grave consequences to her. A few Campbell County residents began demanding that the Library Board and County Commissioners remove access to LGBTQ+ books modelled for children and teens because LGBTQ+ individuals were "criminals" and "dangerous"

and the books were "pornographic," "obscene," and "human trafficking." However, the books targeted for removal by a small fraction of the community, like across the rest of country, dealt with diverse themes and voices including LGBTQ+ content. During that time, Defendants Hugh Bennett, Susan Bennett, and Kevin Bennett (collectively "Bennetts"), three individuals who espoused openly homophobic, transphobic, and other hateful ideologies, relentlessly and maliciously mischaracterized and threatened Ms. Lesley by accusing her of engaging in illegal activities, such as offering and disseminating obscene material to children at the library. These accusations were made publicly and included slanderous personal attacks on her character and reputation, occurring oftentimes in public. The Bennetts went so far as to report Ms. Lesley to the Sheriff and insist she be stripped of her liberty, all because they hated a few books containing LGBTQ+ content, ideas, themes, or authors.[1]

The danger wrought on Ms. Lesley, including threats to her physical safety and that of her colleagues, and the false allegations intended to deprive her of liberty, freedom, her livelihood, and good character were beyond distressing, they changed her life forever. Notwithstanding repeat warnings that Ms. Lesley was in the right for refusing to discriminate in government contracts or remove certain books from the library collection, the Bennetts continued headlong into their vicious smear campaign, knowing full well that their words were laced with falsity, but hoping to galvanize so much pressure on the Library District and Ms. Lesley that Ms. Lesley would engage in unlawful censorship. The Bennetts also hoped to get Ms. Lesley fired, which is ultimately what occurred.

---

[1] It is likely that Defendants will claim they were simply engaged in lawful, if unpopular, protest that is protected by the First Amendment. However, the First Amendment does not protect tortious conduct which the Defendants engaged in to silence, intimidate, and harm those with differing views or identities.

Ms. Lesley now seeks redress for the Defendants' unlawful and unconstitutional conduct pursuant to the Ku Klux Klan Act, 42 U.S.C. § 1985, civil conspiracy, defamation, intentional infliction of emotional distress, and abuse of process claims.

## JURISDICTION, VENUE, AND PARTIES[2]

1.      This action is authorized and instituted under the Constitution and laws of the United States pursuant to 42 U.S.C. § 1985.  Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343.  Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2.      Jurisdiction over Plaintiff's state law claim is proper under 28 U.S.C. § 1367(a) because it is so related to Plaintiff's claims arising under federal law that it forms part of the same case or controversy.

3.      Venue is proper in the District of Wyoming pursuant to 28 U.S.C § 1391(b).  All of the events and omissions alleged herein occurred within the state of Wyoming.  At the time of the events and omissions giving rise to this litigation, Defendants resided in Wyoming.

4.      At all times relevant hereto, Terri Lesley was a citizen of the United States and a resident of the State of Wyoming.

5.      Defendant Hugh Bennett is a resident of the State of Wyoming and owner of Anything Autos.

---

[2] Ms. Lesley also has Constitutional claims pursuant to 42 U.S.C. § 1985(3) for conspiracy motivated by class-based discriminatory animus as well as claims for the violation of her First Amendment rights pursuant to 42 U.S.C. § 1983, hostile work environment, associational, and advocacy discrimination claims and retaliation claims under Title VII of the Civil Rights Act of 1964, against the Campbell County Board of Commissioners, several commissioners, CCPLS, and CCPLS's individual directors, the latter of which she must administratively exhaust with the Equal Employment Opportunity Commission ("EEOC") before bringing an action in federal court. The same day as filing this Complaint, Ms. Lesley has filed her EEOC charge.

6.      Defendant Susan Bennett is a resident of the State of Wyoming.

7.      Defendant Kevin Bennett is a resident of the State of Wyoming.

## FACTUAL ALLEGATIONS

**Terri Lesley's Dedication to the Campbell County Public Library System and Beyond**

8.      Ms. Lesley was born in Wyoming and has resided in Campbell County since the second grade.

9.      Her passion for literature ignited during her early years, thanks to her parents, both avid readers, who filled their home with an extensive collection of books and made weekly visits to the public library.

10.      Throughout her youth, Ms. Lesley found herself drawn to literature, history, and the arts. The pursuit of knowledge and a desire to share that knowledge with others became her driving force, resulting in the realization that she wanted to become a librarian.

11.      Ms. Lesley held a strong belief that libraries should be inclusive sanctuaries supporting diverse communities. She saw libraries as places where individuals of all backgrounds, cultures, and identities could come together and find resources that resonated with their unique experiences.

12.      In 1990, Ms. Lesley earned her Bachelor's Degree in Business Administration and Marketing from the University of Wyoming.

13.      In 1996, Ms. Lesley embarked on her career as a librarian with CCPLS.

14.      Upon entering the field of librarianship, Ms. Lesley made it her mission to create an inclusive and welcoming environment at the library.

15.      In further dedication to CCPLS, Ms. Lesley earned her Master's Degree in Library and Information Science from the University of North Texas in 2012.

16.     As she would continue to do throughout her career, Ms. Lesley received overwhelmingly positive performance evaluations as a librarian.

17.     Her dedication to the work and respect for her co-workers and community led to her promotion in April 2013 to the role of Executive Director at CCPLS.

18.     Prior to becoming Executive Director, Ms. Lesley was a member of CCPLS' management team, holding the position of Senior Financial Specialist. In that role, she oversaw and helped organize two major construction projects—the building of the Wright Branch, which opened in 2003, and a remodel of the Campbell Branch in 2007.

19.     In addition to serving on the Wyoming State Library Shared Purchases Committee, she served on county and CCPLS committees for human resources, personnel, information technology, and compensation.

20.     CCPLS is a Department of Campbell County and includes two public libraries: the Campbell County Public Library also referred to as CCPL (hereinafter "Cambell Branch") located in Gillette and the Wright Branch Library (hereinafter "Wright Branch") located in Wright.

21.     The Campbell County Board of Commissioners is the executive, legislative, and judicial governing body of Campbell County.

22.     It is comprised of five elected Commissioners who have the authority to approve the county's budget and are charged with appointing library board members.

23.     The serving Commissioners at the time were Del Shelstad, Colleen Faber, Robert Maul, Rusty Bell, and Daniel G. "D.G." Reardon.

24.     The CCPLS Board of Trustees (hereinafter "Library Board") is comprised of five members who are limited to serving two three-year terms and are responsible for setting CCPLS policies and appointing the CCPLS Executive Director.

25.     The Library Board consisted of members Charlie Anderson, Dr. Hollie Stewart, Miranda Miller-Finn, Nancy Stoval, and newly appointed member Mandy Steward.

26.     The CCPLS Executive Director is appointed by the Library Board, who in turn are appointed by the Commissioners.

27.     Ms. Lesley was recognized as one of *Gillette News Record*'s Annual "Ten Who Made a Difference" in 2021 for her stewardship of the library and for "standing firm with a marginalized and misunderstood minority of the community and upholding the democratic ideals that serve as the backbone of all public libraries."[3]

28.     In 2022, Ms. Lesley was honored with the American Library Association ("ALA") Intellectual Freedom Round Table's 2022 John Phillip Immroth Memorial Award, and she traveled to Washington DC to accept the recognition.

**Campbell County Leadership Foments LGBTQ Animosity Within the Community**

29.     During the 2021-22 school year, over 1,600 book titles were banned in the United States, a concerning rise documented by PEN America.[4]  This surge in book bans is attributed to coordinated efforts by advocacy groups, such as MassResistance, targeting LGBTQ+ and racially diverse content.[5]

30.     The ALA reports that between January 1, and August 31, 2023, there were 695 attempts to censor library materials and services, documenting challenges to 1,915 unique titles—a 20% increase from the same reporting period in 2022, which marked the highest

---

[3] *Ten Who Made a Difference*, 2022 Gillette New Record, https://www.gillettenewsrecord.com/news/local/article_4d6a1e08-da00-5394-b856-9251993ace96.html
[4] Pen America, *Banned in the USA: The Mounting Pressure to Censor*, https://pen.org/report/book-bans-pressure-to-censor/
[5] Andrew Limbong, *New Report Finds a Coordinated Rise in Attempted Book Bans*, NPR, https://www.npr.org/2022/09/19/1123156201/new-report-finds-a-coordinated-rise-in-attempted-book-bans

number of book challenges in over two decades.[6]  This alarming trend is particularly focused on

young adult books dealing with race, gender, and sexual identity.[7]

31.      This increasing problem of book bans landed squarely in Ms. Lesley's hometown

in the summer of 2021.

32.      The campaign to remove literature started during Pride Month when several

County Commissioners adopted an antagonistic stance towards a Facebook post advising

viewers of books featuring LGBTQ+ ideas and narratives in the CCPLS's youth collection.

33.      In June of 2021, Ms. Lesley, as the CCPLS's Executive Director, received a text

from the CCPLS's Public Relations Coordinator, Genevieve Schlekeway, informing her that

County Commissioner Shelstad had publicly critiqued about a library Facebook post promoting

pride month and Rainbow Book Month.

34.      The Post linked to the Library's Teen Blog and said, "June is pride month and

Rainbow Book Month. For this month's Teen Room blog, a staff member (Sarah) writes about a

few titles you can check out from your library that will connect you with the LGBTQIA+

collection at CCPL."

35.      Commissioner Shelstad questioned whether the county had designated these

months stating: "I don't think the County has designated Pride Month or Rainbow Book Month."

36.      Commissioner Shelstad's public criticism surprised Ms. Lesley because while

Commissioners appoint Library Board Members and approve the library system's budget, they

do not typically get involved in CCPLS's daily operations.

---

[6] American Library Association, *Book Ban Data*, https://www.ala.org/advocacy/bbooks/book-ban-data
[7] *Id*., *New Report Finds a Coordinated Rise in Attempted Book Bans*

37.     Ms. Lesley planned to email Commissioner Shelstad the next day, but before she could do so, email complaints poured in from Commissioners Shelstad and Faber, disparaging the LGBTQ+ post on social media.

38.     In his email to Ms. Lesley, Commissioner Shelstad expressed hostility towards LGBTQ+ community members and library patrons, claiming he was "disturbed" by the post, and that: "I believe that teaching this kind of behavior to minors is up to the parents not the government. It also suggests that we are giving special treatment to a certain group."

39.     Commissioner Faber's email to Ms. Lesley likewise stated: "I . . . also received some messages regarding the teen room advertisement regarding Pride Month and Rainbow Book Month (thinking this was something the county had established). I know there is concern related to the aspect of our teens being minors and I would like to see this type of information and topics be a discussion between parents/families."

40.     Despite Commissioner Shelstad and Faber's purported concerns for minors, their rhetoric intentionally obfuscated anti-LGBTQ+ animus.

41.     Ms. Lesley replied to both and forwarded their messages to the Library Board.

42.     In her response, Ms. Lesley clarified that Pride Month and Rainbow Book Month are national designations. She explained, "The post supports the library mission to provide diverse cultural opportunities for reading, learning and entertainment to all citizens of our community."

43.     Ms. Lesley reached out to the Library Board to see if they also had concerns. She found that not only did none of them have any concerns, but they were supportive of Ms. Lesley.

44.     The ALA has recognized Rainbow Book Month since 2015, and there had been no problems with the celebration in the past.

45.     Ms. Lesley hoped this would put the matter to rest, however, this was not to be the case.

**Defendants and Others Conspire to Intimidate and Harass Supporters of the LGBTQ+ Community**

46.     On July 7, 2021, Commissioner Reardon requested Ms. Lesley's presence at a County Commissioners meeting, anticipating that community members would have inquiries regarding the Facebook post.

47.     Commissioner Reardon wanted Ms. Lesley to be present to address any such questions.

48.     At the meeting, alongside residents expressing explicit anti-LGBTQ sentiments, Commissioner Shelstad asked Ms. Lesley if there was "straight" section in the library or a "straight month" promoted at the library, and concluded, "This is exactly the type of thing that I think is harmful in our community. I'm not asking you to have a straight pride month. I'm just asking you not to have a gay pride month."

49.     The Commissioners' actions spurred the Defendants, who followed their example, and began to voice concerns about the promotion of pride month.[8]

---

[8] Organizing campaigns rooted in transphobia, homophobia, and misogyny bears similarities to the tactics employed by the Proud Boys, a burgeoning extremist group notorious for its militant opposition to LGBTQ individuals and their rights. Proud Boys have been showing up armed to drag queen story hours at public libraries in Nevada, Texas, and California to "protect kids." Proud Boys, for example, held signs accusing attendees of "grooming" children, called parents "sick" for bringing their children, wore t-shirts that said "Kill your local pedophile," accused those reading stories of being "pedophiles" and "groomers," and referred to Pride Month as "groomer awareness month." At least one sheriff's office launched a hate-crime investigation into those "protests," and notably, over 40 members of the Proud Boys faced charges for seditious conspiracy. In the past year, the group has conspicuously escalated its efforts in a targeted campaign against LGBTQ rights. Miller, Cassie, *Proud Boys Aid the Right-Wing Assault on the LGBTQ Community and Reproductive Justice*, Southern Poverty Law Center (July 13, 2022), https://www.splcenter.org/hatewatch/2022/07/13/proud-boys-aid-right-wing-assault-lgbtq-community-and-reproductive-justice.

50.     Hugh Bennett his wife Susan Bennett and their son Kevin Bennett plotted

together and with others to vilify and discredit anyone that opposed their prejudice against

LGBTQ+ individuals and their efforts to suppress these voices.

51.     The Bennetts, like the Commissioners, made little effort to veil their

discriminatory sentiments against LGBTQ+ individuals by suggesting they were protecting

children.

52.     Hugh Bennett, described Pride Month as "immoral," "perverted," and an "attack

on family" going so far as to label it "wicked:"

> "What we're looking at here is the ground game of an attempt to destroy our culture and
> our country . . . I believe what we're seeing is a demoralization of the United States of
> America . . . what you're looking at right here is a promotion of immorality and
> perversion. I think it's pretty easy to figure out what sex you are. And people who control
> information in our society . . . it's an attack on the basic family structure because the
> basic family structure is the one thing that's the strongest that resists government and
> wars and immorality and losing the will to go on . . . this is an assault on our morals, our
> ethics, our heritage, our belief in God. . . a lot of this is really subtle and wicked in its
> intimidation by authority figures of our most vulnerable people in society – our teens and
> preteens . . . we have laws about perversion and sex before somebody comes of age and it
> could be argued that what they're doing is pandering to minors' immorality . . .
> ultimately, it can lead to suicide."

53.     Kevin Bennett described Pride Month as "pedophilic" and made claims about

child molestation occurring in public:

> "Never have I seen heterosexuality in teenagers encouraged for an entire month at the
> public level and we know why . . . if we're not encouraging heterosexuality among
> teenagers under the age of eighteen, up to nineteen I suppose, for a month in the public
> library, we definitely should not be doing that with sexual identities that are known to
> cause suicide and HIV. That's just common sense. In fact, there's an argument to be
> made that there's a pedophilic nature to the sort of governance that would encourage that
> and not bat an eye when it comes . . . you have to take a book like The Babysitters'
> Coven . . the people that are involved in these departments, which push this agenda do
> prey on young people . . . In Austin, Tatiana Mala Nina, a convicted child molester,
> dressed in drag and danced at child story time. Not in the teen section, but in the
> children's section of the Austin, Texas library . . . That's happening there because they
> had an LGBTIA teen month for a few years until it became inured in the community to

the point where people didn't even bat an eye, and then child molesters are out there playing with your children in public in broad daylight . . . I've known three people who committed suicide. One of them, Richard Kennedy, from Cheyenne, WY made a transition a few years ago . . . he was not a very attractive young man. He was not a very attractive young lady. And everybody told him he was bold and brave, and he knew deep down they were lying to him. And he killed himself. It wasn't because of the bigots that he killed himself. It was because of the people who share this agenda that he killed himself. And he's not the only one. So what this is doing is sowing seeds of suicide, drug addiction, domestic violence, you can look at the statistics. And it shouldn't be in our community . . . it's coming here if we don't stop it. There are going to be people who die that didn't have to." [9]

54.     Susan Bennett urged the Commissioners to consider disciplinary measures against

the Library Board:

"What's happened at the library . . . if I had a child that was a kleptomaniac, I'm not going to educate everybody about why my child is a kleptomaniac and teach them how they do it and why they do it. Then the next thing you're gonna see is other kleptomaniacs coming out of the closet. If you have an issue in life and a behavior in life, We love everyone. We accept everyone. But that doesn't mean we have to teach them the behavior and promote it. That's their issue. We will support them and we will get around them but it doesn't mean that is a normal behavior or that is the way we were created or the way we should go forward. All of this coming out of the closet and everything has gotten way out of hand . . . we should have a moral compass and we all know what that moral compass is. we know where all the laws of the land have come from the beginning of our existence and we need to go back to see what that says. We need to have a moral compass . . . we have seen the increase in suicide, we have seen the increase of miserable human beings out there, Antifa and the Black Lives Matters and all this . . . We need to do the responsible and moral thing . . . I want to encourage you to look at that board, at the Library Board and at the very least give them some discipline as to what they did because they did not represent our community in June . . . it's time to address it."[10]

---

[9] This rationale that one library somewhere missed identifying one performer who was a child sex offender, does not mean all drag queens or LGBTQ+ people are child predators. The argument makes as problematic and dangerous a leap in logic as saying that all priests are pedophiles. The existence of one does not then mean they all are. There are far more examples of men of the cloth engaging in systemic child pedophilia, and no one is aiming public arguments that all pastors are bad, no pastors should be allowed in the library, or all religious books should be removed.

[10] This censorship has serious, and widely-known impacts. Robbing communities of access to voices, history, learning, etc. is intentionally destructive, such as when North American

55.    The Bennetts also asked the Commissioners to move books that centered around the experiences of LGBTQ+ people from the children and teen collections.

56.    The books specifically mentioned included: *A Quick & Easy Guide to Queer & Trans Identities* by Mady G and Jules Zuckerberg, *All Out: The No-Longer-Secret Stories of Queer Teens throughout the Ages* edited by Saundra Mitchell, and *Music from Another World* by Robin Talley.

57.    Adding to the Bennetts' campaign of oppression, some residents also expressed explicit anti-LGBTQ rhetoric in support of their request to have the books moved, such as:

a)    "We have a friend with a twelve-year-old daughter that we've known since birth. She's always been a feminine little girl that loved dresses and looking pretty. Now at twelve years of age, she's decided that she's polysexual. Do you know what that means? It means attracted to people of multiple genders. That definition in itself makes no sense as there are only two genders. Our children are being bombarded with sexual terms such as asexual, intersexual, bisexual, polysexual. Our library does not and should not be promoting these ideas in the minds of these young, very impressionable children, and I hope that you'll see to it that this does not continue on in the future."

b)    "I think our library should be promoting things that are wholesome, and build good character in kids, and not confusing with all these many sexual type directions that they could go in life . . . it's just the demoralization of our nation."

c)    "The essence of what we are dealing with here is all about the image of God. . . None of that describes the alphabet soup of LBGTQISG or whatever it is and then with a plus sign at the end, so you can add whatever it is that you want including pedophilia and all kinds of unimaginable things. And I would just

---

Indigenous children were not given access to their language or culture in a cultural assimilation campaign in which they were forced to attend boarding schools under the horrendous, "kill the Indian in him and save the man." This is a widely-used and well-known strategy for rendering a community invisible and destroying them. This is precisely why libraries across the country are experiencing the most basic challenges against books that mention racial histories, famous black authors such as Toni Morrison, Native American authors like Sherman Alexie, and queer authors and stories. The strategy is intentional.

ask the five of you to do your duty to the approximately ninety-five percent majority that is totally against this and to do your duty before God."

d) "We're promoting the basest of base things in our society . . . there's nothing virtuous about that . . . let's not promote animalistic behaviors."

58.     Ms. Lesley addressed the meeting participants and emphasized that the library was a "neutral place" whose mission was "to provide diverse cultural opportunities for reading, learning and entertainment to all citizens of our community."

59.     That afternoon, Commissioner Reardon proposed that Campbell Branch should close off its entire teen section due to the presence of a few LGBTQ+ themed books, arguing, "that whole discussion was my concern on the teen room being "dark" with only "bad" books. I would suggest you take a look at that. The only solution to that in my short sightedness would be to close that section of the library off and not have a teen specific area which I don't think is what the library wants to see."

**Defendants Coordinate Efforts to Steamroll and Destroy the Lives of Anyone Associated with or Advocating Against LGBTQ+ Oppression or Censorship.**

60.     The Campbell Branch had a magic performance scheduled for July 14, 2021.

61.     The program was a straightforward magician's performance.

62.     The magician had an excellent reputation, was in high demand, and had no history of presenting inappropriate content.

63.     After the public meeting, Ms. Lesley received an email from Commissioner Shelstad expressing concerns about the Campbell Branch hosting a magic program the following week. His email stated, "Doing a search of the magician [ ] shows this is a transgender act. I am not thinking this is a good idea. Taxpayer money going to things like this only upsets the tax payers of our County more."

64.     Unaware of this information, Ms. Lesley examined the performer's online presence, including her professional platforms, Facebook, and Instagram, and found no information regarding her gender identity.

65.     In fact, as stated on her website, the performer had an extensive track record that included performances at venues such as Six Flags and the Iowa State Fair, appearances on CNN and the Travel Channel, as well as features in publications like USA Today and PinkNews.

66.     Ms. Lesley responded to Commissioner Shelstad via email that the magician program was "strictly a magician's show."

67.     She explained to Commissioner Shelstad that "the program was professionally recommended, highly reviewed, and the magician has performed for children at libraries all across the Midwest – on countless occasions – with no issues."

68.     Nevertheless, news about the magician's gender identity began to circulate within the community, spurred by the Commissioners and Bennetts.

69.     It was clear that a coordinated effort was underway to rally the residents against the magician and library event.

70.     A local pastor and former Wyoming State Representative, Scott Clem, posted his objections about the "transgender magic show" on social media, sparking further controversy.

71.     He claimed the event may be a "cover to introduce and glorify something more insidious and harmful," "talk about sexual issues with our teens," and "exploit our kids to a sexual agenda like the library has been doing over the last month."

72.     As the date of the magic program's date approached, library staff began to receive threats.

73.    For example, an unidentified individual parked near the Campbell Branch's entrance, entered the building and warned front desk staff that they should "cancel the program or else."

74.    The magician also reported receiving violent and frightening threats online and by telephone.

75.    All threats were reported to the police department and security measures were planned for the magic show.

76.    In spite of the threats, the magician initially indicated she wanted to proceed with the program as scheduled.

77.    However, at the last minute, she decided, for the safety of the children attending, the staff, and herself, to cancel the event.

78.    Notwithstanding the cancellation, protestors gathered outside the Campbell Branch on the scheduled day, displaying posters with messages such as "Don't Trans Our Kids" and "Your Library Ok's LGBTQ."



79.    At the monthly public Commissioners meeting on July 20, 2021, a group agitating for censorship again made their presence felt.

80.     Among them were Kevin Bennett and Hugh Bennett, who held themselves as

speaking for the group of censorship advocates.

81.     On the public record, Kevin Bennett criticized the Commission for the scheduling

of the magician program solely because of the magician's gender identify and blamed Ms.

Lesley for not uncovering the magician's gender identity earlier:

> "A lot of performers let me tell right now you there's some perverted sons of guns. If
> Terri Lesley did no background check on this individual, how do we know that there
> haven't been no transexuals in this community before . . . what kind of political
> shenanigans are we hiding behind that we are bringing transsexualism into this
> community. There are people wearing rainbow flags, rainbow shirts back there…we are
> saying that tax dollars should not be spent in a way that puts children in situations of
> danger, and this Board was told about June Pride Month. I talked to all of you. I emailed
> all of you. Now, when we talked about that, we didn't know there was a transexual
> coming. Somebody at the library did and if they didn't, they dropped the ball. A dog
> guarding a hen house who lets the fox in is a bad guard dog. If he meant to do it, if he
> didn't mean to do it, it doesn't matter. That's a breach of the public trust and community
> endangerment."

82.     Hugh Bennett urged the Commission to wield their governmental authority and

protect the children from what he referred to as "perversion."

83.     Hugh Bennett further blamed Ms. Lesley for failing to disclose to the library

board that the magician was transgender:

> "Right now there's a battle for the soul of America going on. . . you men are in positions
> of authority. Exercise it. What's the problem with protecting our children from
> perversion? . . . why aren't you doing anything? We've got a library director who was
> either unaware or unwilling to disclose at the last meeting that we had a transgender
> performer scheduled for our kids. Now. I don't know precisely what happened behind
> closed doors concerning that performer begin cancelled, but the narrative is that the
> performer cancelled itself. The performer cancelled his performance due to death threats,
> which is patently false. There's been no death threats, but that's what the media picked
> up. The people who want to pervert our kids love to paint themselves as victims who are
> misunderstood. Turn your back on them and see what happens."

84.     A few days after the meeting, Ms. Lesley received a chat transcript from an

anonymous source which disclosed that Commissioners Shelstad and Faber were collaborating

with some community members to organize protests against LGBTQ-related content and the

magician's show.

85.     The messages disclosed Commissioner Shelstad and Faber's involvement in

orchestrating efforts with community residents to ban library books with LGBTQ+ themes,

content, ideas, and authors, which emphasized support for those communities.

86.     In the group chat, with Commissioner Shelstad and Faber, one resident blamed

Ms. Lesley for lying about not knowing the magician's gender and precipitating the termination

of Ms. Lesley.

> "We need to run a hard email campaign where we all send individual messages to the
> commissioners and possibly the library board. I think it would be the wise to get
> ourselves all on the same page, I figure we can do that tomorrow. Thanks for finding that.
> This confirms what I expected. The library brought [sic] [the magician] in on our tax
> dollars without informing us. At all. And we have the video evidence this guy is a
> tranny.[11] That should not be put in front of kids even if he's the most milquetoast
> performer on the planet, because it's a method of ideological subversion. It's grooming.
> Softening the kids up so they'll be more accepting of this perversion as they get older. No
> way around it. That lady at the meeting on Tuesday lied through her teeth as regards
> neutrality, the whole board needs to be fired, and I think there's a strong case to make
> that happen even twisting the arms of the liberal commissioners. I said there would be
> trannies doing entertainment at the library last week. I am flabbergasted that such events
> were less than a week out. I find it impossible that the lady who said she was neutral was
> unaware of this upcoming event. She knew full well and pretended she was being neutral.
> That alone is against our community and our taxes, and in my view constitutes letting her
> and others with her go from the library board. I'm going to screen shot these images.
> Thanks again, see you tomorrow."

**Defendants Employ Tactics from a Hate Group's Playbook to Advance their Agenda and
Target Opponents**

87.     Hugh Bennett authored an article in his business's print magazine also named

"Anybody's Autos," in which he discussed the magician's show and provided a detailed account

of his efforts to advocate for its cancellation.

---

[11] The term "tranny" is often used in a defamatory manner and as a slur against transgender individuals "to
humiliate and degrade" them. Bass, Lance, *Why We Shouldn't Use the Word 'Tranny*,' HuffPost (Dec. 23,
2011),  https://www.huffpost.com/entry/why-we-shouldnt-use-the-word-tranny_b_1168078.

88.     Within the article, titled "Local Residents help SPIKE Taxpayer Funded Library's Transgender Performer," Ms. Lesley is mentioned by name no less than four times.

89.     The article accuses her of failing to inform the Commissioners about the magician's gender and of lying about the threats received against the library staff and the magician.

90.     Furthermore, the article criticizes the library for "circulating LGBTQIAP+ propaganda" and "targeting our children."

91.     In his article, Hugh Bennett, acknowledged deploying strategies used by MassResistance in mobilizing opposition against specific library books and pressuring the library to cancel the magician's performance.

92.     MassResistance, an organization known for promoting virulently anti-LGBTQ views, gained notoriety after being labeled as a hate group by the Southern Poverty Law Center.

93.     Its founder and president, based out of Massachusetts, continually links homosexuality to pedophilia, violence and disease, and links trans women to sexual predators.

94.     Among its activities, MassResistance provides a playbook outlining tactics aimed at discrediting leadership, targeting supporters, identifying specific books for scrutiny and advocates for a confrontational style of activism.

95.     Kevin Bennett, founder of the MassResistance Wyoming chapter and organized a booth at the County Fair in August 2021 to actively recruit others to join the Bennetts' suppression and censorship campaign.

96.     He not only encouraged attendees to become members of the local chapter but urged them to sign petitions advocating for the banning of LGBTQ+ themed books and estranging LGBTQ+ community members from the library system.

97.    Soon, electronic billboards paid for by MassResistance began appearing throughout Gillette, displaying messages such as "child indoctrination at our library" and "inappropriate youth books in the library."





**Defendants Escalate Their Protectionist Rhetoric and Accusations of Criminal Behavior Against Ms. Lesley**

98.      As a result of the billboard signs, the Anybody's Autos article and ongoing accusations being directed at Ms. Lesley and the Campbell Branch, tensions in the community continued to escalate.

99.      During a Library Board meeting on July 26, 2021, community residents vociferously criticized Ms. Lesley and the Library Board, accusing them of corrupting, grooming, and indoctrinating children while promoting danger and pedophilia.

100.      To address the escalating tensions and residents' complaints regarding specific books, the Library Board and County Commissioners convened a joint meeting on August 12, 2021.

101.      At the joint meeting, Ms. Lesley provided an explanation of the existing CCPLS Collection Development Policy and outlined the process for submitting book challenges pursuant to a Request for Reconsideration of Library Materials.

102.      She encouraged community members to follow the established policy when doing so.

103.      The CCPLS book reconsideration policy consisted of a series of steps:

a) The first step requires a patron to find a librarian and explain what the patron finds objectionable with a book and why the patron believes the book should be removed from the library's collection.

b) Next, the librarian works to resolve the patron's concerns through a verbal discussion.

c) After that, if a satisfactory resolution cannot be reached, the patron is asked to submit his or her request in writing by completing the "Request for Reconsideration of Library Materials" form, which serves as the formal record of their complaint.

d) Once completed, copies of this form are distributed to three key individuals: the library branch's executive director, the manager responsible for the specific collection containing the book, and the patron who initiated the request.

e) Then, the collection manager reviews the patron's concerns, examines book reviews, and reads the book in question. Based on his or her assessment, the collection manager formulates a recommendation and composes an official response.

f) This response, along with the recommendation, is reviewed by the executive director of the library. The executive director's role is to ensure that the process has been correctly followed and that the decision or recommendation aligns with library policies.

g) After the executive director reviews the response, a letter is sent to the patron via mail. This letter conveys the library district's final decision or provides a recommendation for further action.

h) Then, if the patron remains dissatisfied with the outcome, he or she has the option of requesting to discuss the determination further with the executive director, who attempts to address any lingering concerns and mediate a resolution.

i) If the conversation with the executive director still does not bring about a satisfactory resolution, the patron has one last recourse. The patron can file an appeal with the Library Board, which holds the ultimate authority to decide whether a book will remain in the library branch's collection. The Library Board's decision marks the final chapter in the reconsideration process.

104.    At the meeting Ms. Lesley explained that the library system had not received any such requests, except for one instance when a child asked a library manager about one of the *Diary of a Wimpy Kid* books.

105.    Ms. Lesley revealed that the library system had not faced any book challenges until they started receiving anti-LGBTQ+ book challenges in 2021. During her time as Library Director, none had progressed beyond the manager's response.

106.    Despite the policy, the Bennetts and their followers continued to complain that the books they had identified were still on the shelves and called for their immediate removal.

107.    They blamed several of the Commissioners, the Library Board, and, particularly, Ms. Lesley, for not removing the books.

108.    During the public comment session of the August 3, 2021, meeting, Kevin Bennett offered a prayer, beseeching Commissioners Maul, Bell, and Reardon to repent or be removed from office.

109.    He demanded the same of Ms. Lesley, stating "Lord Jesus God, please remove her, recall her, put people in place that will take care of our children… keep this wickedness from happening."

110.    Susan Bennett also spoke at the meeting, accusing Ms. Lesley and others of "criminal offense," "putting our children in danger," of "child neglect," and arguing that Ms. Lesley and others were dangerously close to violating laws:

> "Part of your oath is . . . to represent us . . . All I've seen since I was here last time is your legal discrimination statement . . . you are discriminating against latchkey children . . . this is not against intolerance or discrimination against LGBTQ+. This is about children and we need your support and your help to change the policies to look into the library policies that you appointed with trustees. Those beautiful girls that were here. They are not equipped to handle the materials, and we cannot go through every one of those books . . . we have to have policies in place that you're elected to put in place [leaving these books in place is a]. . **criminal offense . . . legally, you are putting our children in danger . . .** we need to be watching out for the children that don't have adequate traditional nuclear families . . . this is enticement, **this is child neglect, and you guys be warned. There are law and you guys are very close to violating all of them**."

111.    Between August and November 2021, seventeen individuals submitted fifty-seven requests for reconsideration on twenty-nine library books.

112.    Most of the books that censorship advocates were seeking to remove from the children and teen collections were centered around the experiences of LGBTQ+ people and included age-appropriate content with that theme.

113.    No request was submitted from a parent whose child looked at or checked out any of the challenged books.

114.    Among requests for reconsideration received, Commissioners Faber, Maul, and Shelstad submitted three, the Bennetts submitted seven, and the rest came from various other community residents.

115.    All three Commissioners submitted challenges to *This Book is Gay* by Juno Dawson.

116.    Kevin Bennett challenged the following three books: *A Quick Easy Guide to Queer & Trans Identities* by Mady G., *Music From Another World* by Robin Talley, and *The Babysitter's Coven* by Kate Williams.

117.    The first two books predominantly focus on LGBTQ identities, while, according to Kevin Bennett, the third book includes critical race theory and an attack on White culture because one of the protagonists is Black:

> "People of color represent several of the characters in the book and they're represented as cool whereas the protagonist and first person is just sort of a boring gothy white chick. It sort of romanticizes a different cultural set which I think is very damaging especially in this region where let's face it none of us tan very well . . . In this library, we see the gay agenda, critical race theory (CRT), and occultism. CRT and the gay agenda are both in this book. Albeit in a minor capacity, but all you need is one percent rat poison and ninety-nine percent bait and that will kill a rodent. You don't need a lot of poison to poison somebody, so the amount is not the issue. It's that it's there at all. Occultism is also in the *Babysitter's Coven*. These three things represent problematic narrative flaws . . . . CRT defines the characterizations of supporting characters in the story – Cassandra and Dion – causing white readers to experience unnecessary cognitive dissonance whose uber purpose from a social Marxism framework is to demoralize, confuse, and initiate self-hatred based on ethnicity. It's subtle, but it's there, and that shouldn't be introduced to teenagers who already have enough problems."

118.    Ms. Lesley adhered to the CCPLS official book challenge policy. She began to review the challenged books.

119.    Although she was complying with the process, the Bennetts relentlessly continued to appear at Commissioners and Library Board meetings and accusing Ms. Lesley of criminal and immoral behavior. For example:

a)  On August 17, 2021, Kevin Bennett at a Commissioners meeting claimed with respect to Ms. Lesley that, "I'm here to address what seems to be illegal activity taking place [in the library]… anyone who knowingly encourages sexual intrusion should be convicted…fools should be removed from their positions and other people should be put in their place "

b)  On September 21, 2021, Susan and Hugh Bennett at a Commissioners meeting distributed a document purportedly informing attendees about Wyoming rape laws and their application to the library's book collection.

c)  At that same Commissioners meeting, Hugh Bennett asked the Commission to remove members of the Library Board because their actions conflicted with "state criminal statutes in Wyoming."

d)  Likewise at that meeting, Kevin Bennett called for the Commission to hold those who declined to remove the challenged books accountable, arguing that the Commissioners were "playing politics rather than doing their job," and insisting that the Commissioners replace library staff, implying Ms. Lesley, "with people who have good judgement" instead of having the reputation "of bringing gay porn to kids."

120.    Rather than permitting Ms. Lesley to adhere to the library system's policy, the Bennetts worked together towards their political objectives by intensifying their harassment of Ms. Lesley. This was a deliberate tactic aimed at intimidating her into complying with their censorship demands.

121.    When their efforts continued to fail, the Bennetts intensified their efforts to have Ms. Lesley arrested.

**Hugh and Susan Bennett Take Their False Accusations of Criminal Activity to the
Campbell County Sheriff's Office and Try to Have Terri Lesley Arrested and Imprisoned**

122.    Upon information and belief, on September 29, 2021, Hugh and Susan Bennett
went to the Campbell County Sheriff's Office and formally accused Ms. Lesley of offering and
disseminating obscene material to children at the library in violation of Wyoming criminal laws.

123.    Their allegations to the police characterized the library books they wanted
removed, and which Ms. Lesley had declined to do so, as "horrible, vile, erotic content unfit for
children, akin to materials found in adult bookstores."

124.    Hugh and Susa Bennett identified five books, which Hugh Bennett called "hard-
core pornography to children," and said carrying the books was "felony behavior:"

- *Dating and Sex: A Guide for the 21st Century Teen Boy* by Andrew Smiler.

- *Doing it!: Let's Talk about Sex, Consent. Virginity. Masturbation. LGBTQ.
  Sex Ed. Contraception. Healthy Relationships. Sex Shaming. Body Image.
  STIs. Sexual Pleasure* by Hannah Witton.

- *Sex Is a Funny Word, A book About Bodies, Feelings, and You* by Cory
  Silverberg and Fiona Smyth.

- *How Do You Make a Baby* by Anna Fiske

- *This Book is Gay* by Juno Dawson.

125.    They further accused Ms. Lesley of engaging in "felonious conduct" and, upon
information and belief, filed a criminal complaint against her.

126.    The Bennetts called for the arrest of Ms. Lesley on the basis of "obscenity and
solicitation of minors."

127.    Reiterating the criminal accusations at an October 5, 2021, Commissioners
meeting, Susan Bennett alleged that if Ms. Lesley had removed the challenged books in June and
July, then she and her husband would not have filed charges, indicating that Susan and Hugh

Bennett intended to compel Ms. Lesley's to comply with their demands against her will by accusing or threatening to accuse her of having committed a crime.

128.    Susan Bennett's full statement was as follows:

"I'm not part of a hate group. I love LGBTQ people . . . I thank you for your courage of convictions . . . **there would be no charges brought against anybody should something have been done way back in June and July when this issue started. This would have been over.** However, the public is doing everything they can to be heard. There is a definition of obscene materials . . . the book How to Make a Baby is not education…it's obscene. It's not my opinion . . . it's obscene and offensive to many people who are trying to get their voices heard in the most polite way possible . . . **you have a bad apple** . . . I love Terri Lesley as a human being and I know she's sincere and thinks she's doing the right thing. However, her actions are speaking very loudly . . . she was very annoyed and disrespectful to you . . . she's getting a very high paid salary that you guys need to consider . . . we are asking for her responsibility . . . **but that attitude . . . there's no cooperation here, so it's coming to this level. The disrespect to children who have had child abuse when something like that happens . . . a child that's been a victim of child abuse can be very harmed by what's being allowed here**."

129.    Wyoming criminalizes acts by which a person, with the intent to compel action or inaction by someone against her will, accuses or threatens to accuse her of a crime or immoral conduct which would tend to degrade or disgrace her or subject her to the ridicule or contempt of society. *See* W.S. § 6-2-402(a)(ii).

130.    Under Wyoming law, the conduct described in the previous paragraph is felonious conduct that is punishable by imprisonment for not more than 10 years. *See* W.S. § 6-2-402(b).

131.    After admitting that she and her husband would not have accused Ms. Lesley of having committed crimes had she complied with their demands, Susan Bennett then called on the Commissioners to hold Ms. Lesley accountable for her "disrespect to children," who she called victims of "child abuse." She characterized Ms. Lesley's actions as harmful to "victims of child abuse."

132.    At the same meeting, Hugh Bennett asked the Commissioners to fire Executive Director Lesley and the Library Board.

133.    The Bennetts use of such allegations and inflammatory language were mere tactics to garner support, media attention, and apply pressure, rather than a sincerely held belief that Ms. Lesley was engaging in "child abuse," "pornography," or "felonious conduct" for simply failing to remove certain books.

134.    At the Commissioners meeting on October 19, 2021, Kevin Bennett brought a sign stating: "FIRE THE DIRECTOR."[12]



135.    At an October 25, 2021, Commissioners Meeting, Kevin Bennet held up a sign throughout the meeting which read: "CCPL Knowingly Encourages SEX for Minors and That's

---

[12] Certainly, the Bennetts, like any other community members, have the right to critique public employees or call for the end of an employee's tenure. Such speech typically falls within the scope of and is protected, under the First Amendment. However, in this particular case, while this speech alone may not be legally actionable, it serves as additional evidence of an ongoing campaign against Ms. Lesley. This campaign, characterized by the Bennetts' relentless and media-savvy efforts, was aimed at illegally blackmailing or extorting Ms. Lesley and increasing pressure on her to remove certain books sans lawful authorization. It reflected their singular, intense, and persistent drive to advance their political agenda and ideological mission by any means necessary, including attempting to discredit or remove Ms. Lesley and others they viewed as obstacles.

a Crime."



136.    As a result of Hugh and Susan reporting Ms. Lesley to the Campbell County

Sheriff's Office, on October 27, 2021, Michael Stulken, a Weston County and Prosecuting

Attorney, carefully explained why the charges against Ms. Lesley filed by Hugh and Susan

Bennett were unfounded and not prosecutable under the law.

137.    In a letter to the Cambell County Sheriff, the County Attorney outlined that the

books in question did not meet the legal criteria for being considered "obscene" as defined by

Wyoming law and underscored that no other legal grounds existed to support "criminal

prosecution for the subject matter in question."

138.    In a comprehensive and well-researched response, the County Attorney

emphasized that his office had "devoted considerable amount of time to research the criminal

statutes and attendant case law" and personally examined the materials in question.

139.    He stated that the books in question, even when measured against contemporary community standards, did not criminally describe sexual conduct that could be deemed patently offensive. Moreover, these materials potentially held scientific value.

140.    The legal memorandum clarified that Wyoming obscenity laws did not apply to individuals engaged in public library activities or while employed by such an organization, such as Ms. Lesley and other library system staff.

141.    Despite the County Attorney's clear legal analysis, the Bennetts were undeterred.

142.    Hugh Bennett told the press, "I'm not going to change my mind because of something a lawyer chooses to do or not do." [13]

143.    When he made this statement to the press on October 27, 2021, Mr. Bennet publicly admitted that he planned to disregard the County Attorney's public confirmations that Ms. Lesley had not violated any of the criminal laws that the Bennetts previously publicly alleged she had violated.

144.    Despite being informed by an authoritative and credible public source that their accusations of criminal conduct were false as a matter of law, the Bennetts persisted in spreading inaccurate, misleading, and malicious information and accusations about Ms. Lesley, accusing her of engaging in criminal misconduct for not removing the books they objected to.

145.    For example, on February 28, 2022, Kevin Bennett complained at a Library Board meeting that if a book he wanted removed was not moved "to the adult section or removed entirely, you [Ms. Lesley] are guilty of knowingly encouraging and/or enticing minor sexuality. This is a crime."

---

[13] Associated Press, *No Charges for Wyoming Librarians over sex ed, LGBTQ Books*, https://ktar.com/story/4741970/no-charges-for-wyoming-librarians-over-sex-ed-lgbtq-books/

146.    The Bennetts knew that their allegations against Ms. Lesley for committing crimes were false at the very least but no later than, October 27, 2021.

147.    The Bennetts also knew that by continuing to publish their demonstrably false defamatory statements that Ms. Lesley was engaged in criminal activities they encouraged others to repeat their false and defamatory statements about Ms. Lesley, thereby aiding and abetting or encouraging more defamation by third parties.

148.    Emboldened by the Bennetts, other community residents also began to disseminate accusations of misconduct against Ms. Lesley, accusing her of "being dishonest" and demanding her termination.

- Notwithstanding the County Attorney's memorandum discussing the book, one Campbell County resident claimed Ms. Lesley was endangering children because of her failure to remove a book, despite the Weston County Attorney's Office confirming that it was not obscene: "There's sodomy foreplay for four-year-olds in our library in this book *Sex is a Funny Word* . . . You're lying to us . . . Terri Lesley, we don't believe you. We want something done. Our children are in danger because of you guys."

- Another resident repeated the sentiment that Ms. Lesley was dishonest and requested that the Library Board "remove Terri Lesley as Director of the Library or force her resignation for repeatedly being dishonest with the citizens of Campbell County . . . I am requesting that Terri Lesley be removed from her position and replaced with a person who is honest and truthful that the public deserve."

- Another two Campbell County residents explicitly mentioned and paraphrased *Sex is a Funny Word* by Cory Silverberg and Fiona Smyth as a "repulsive," "obscene," "sexually explicit" book that should be removed despite Weston County Attorney's determination that the book was not obscene under the law.

149.    The Bennetts continued to challenge books similar to those that the County Attorney had already determined were not obscene, including titles like *Sex Plus: Learning, Loving, and Enjoying your Body* by Laci Green, *Gender Queer* by Maia Kobabe, *Lawn Boy* by Jonathan Evison, and *Be Amazing: A History of Pride* by Desmond is Amazing.

150.    At a Library Board meeting, Hugh Bennet told the members, "You're fighting a losing battle and the longer you resist, the worse it's gonna be."

151.    To address concerns related to book challenges, the CCPLS staff created a marketing campaign.

152.    This campaign aimed to educate parents on how to link their children's library cards to their own, enabling parental supervision of their children's reading choices.

153.    However, despite these efforts, the library continued to receive book challenges and the Bennetts continued to discredit Ms. Lesley and call for her termination for refusing to capitulate to their demands to remove books.

### Defendants' Efforts to Influence the Library Board and Silence Ms. Lesley Have Their Intended Effect and Ms. Lesley is Terminated

154.    In early February, Library Board member, Dr. Hollie Stewart, resigned from her position.

155.    In April, the Commission appointed Sage Bear, the wife of State Representative John Bear, to the Library Board.

156.    Susan Bennett thanked the Commissioners for appointing Ms. Bear, stating: "I want to thank you for the good judgment you showed in appointing Sage Bear. I think she'll do a great job and the reason I believe she's qualified is that she hasn't signed on to this new I guess you would call it the LGBTQAI agenda, the diversity, equity, inclusion talk we're hearing – the DEI agenda."[14]

---

[14] Although well within her First Amendment rights to express these views, Susan Bennett's comments indicate that she did not genuinely believe Ms. Lesley or any library staff had violated Wyoming criminal statutes or were engaged in child or sexual abuse. Instead, Ms. Bennett shows she was pursuing her political and ideological objectives, aiming to remove individuals she saw as obstacles to her discriminatory agenda and censorship campaign and eliminating access to diverse, LGBTQ+, and racially equitable literature, content, and voices.

157.    Ms. Lesley met with Ms. Bear to bring her to speed on the book banning campaign.

158.    During this meeting, Ms. Bear proposed moving certain books from the children's section to the adult section and also suggested placing warning signs in the library to alert parents about children's access to all of the library's collection.

159.    Ms. Lesley informed Ms. Bear about the legal precedent set in the case of *Sund v. City of Wichita Falls*, 121 F.Supp.2d 530 (N.D. Tex. 2000), which discussed the legal problems with limiting access to books and its potential violation of First Amendment protections.

160.    Additionally, on March 7, 2022, Ms. Lesley shared with Ms. Bear a legal analysis provided by Emily Williams, a Campbell County Deputy County and Prosecuting Attorney on March 7, 2022 regarding Campbell County Public Library System's Collection Development Policy, Requests for Reconsideration, and Procedure for Appeals to the Library Board.

161.    Attorney Williams had advised the Commissioners that, "Due to protections for freedom of speech and religion under the First Amendment, the current library policy rejects appeals based on content deemed offensive by a group or individual . . . The recent appeals to the library are based on content which is objectionable to the applicants' personal beliefs . . . relocation of two books is arguably censorship and therefore a violation of policy and the law."

162.    Unhappy with County Attorney's legal position on the issue, Ms. Bear sought a second opinion from private counsel Nick Norris of Lubnau Law Firm.

163.    She requested a legal opinion on two matters: moving specific children's books labeled as "objectionable" from the children's section to the adult section of the library, and the possibility of adding "community standards language" to the library system's mission statement.

164.    The legal analysis from Mr. Norris advised against relocating specific children's books, stating that it would violate the First Amendment.

165.    The analysis quoted the *Sund* case but went on to say:

It should be noted that *Sund* is not binding authority in Wyoming, however, the Tenth Circuit, which is binding here adopted reasoning from *Pico* in *Case v. Unified School District* #233 908 F. Supp 864 (D. Kan. 1995). The plurality went on to hold that, "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.' In short, the Library will violate the First Amendment if it relocated children's books deemed objectionable from the children's section to another section of the library.

166.    The analysis also indicated that while adding "community standards" language to the mission statement was not a direct First Amendment violation, it was "not advisable" and could lead to legal scrutiny.

The act of changing the mission statement will not in and of itself cause any harm or cause a First Amendment violation. However, the act of restricting access to certain books in a public library based upon "community standards" almost certainly would cause First Amendment violations.

167.    Ms. Bear expressed her disappointment with Mr. Norris' response and vowed to seek "other counsel."

168.    In April 2022, the Bennetts launched additional challenges, this time concerning the parenting collection in the children's department, which historically enjoyed parental support.

169.    In an attempt to find a compromise, Ms. Lesley suggested housing the collection on higher shelves to prevent small children from accessing the books.

170.    However, the Bennetts continued to call for Ms. Lesley's resignation.

171.    In a Commissioners meeting on April 5, 2022, Susan Bennett asked that the Commission limit the library administrator's job or engage in additional scrutiny over the position because of Ms. Lesley's refusal to remove books challenged by the Bennetts:

> "In the books and content we're talking about, there's no supervision, there's no cautionary warnings. There's no discretion. They're giving it to them and they're not moving them. Therefore, that administration's job either needs to be limited or some more accountability over it . . . when they have such an influence on our community . . . those policies have to be changed . . . for children."

172.    During an April 17, 2022, Commissioners meeting, Hugh Bennett again expressed dissatisfaction with the County Attorney's lack of action "concerning a complaint about illegal activity at the library," and threatened that he would "hate to run a political campaign based on being porn-friendly to kids."

173.    On May 13, 2022, the Commissioners decided to cut what is known as the 1% budget designated for youth programs from the Library system  as punishment for its refusal to move the challenged books from the children's section.

174.    Kevin Bennett and his group advocated for the cut to funding "because for eleven months we've asked library staff to simply move the books into the adult section of the library and for eleven months, they have refused and lied in order to push their perspective."

175.    Ms. Lesley and the Library Board Chair, Charlie Anderson, made an appeal to the Commission to reconsider this decision, arguing that it unfairly affected the children who would suffer as a result. The Commissioners did not reverse the funding cut.

176.    As a result of the funding cut, approximately $32,600 was withheld from the children's section of the Campbell Branch.

177.    Kevin Bennett expressed gratitude to the Commission for cutting the funding.

178.    Kevin Bennett further claimed that the funds were being used inappropriately to promote what he referred to as "an agenda of propaganda."

179.    He stated that the country needed kids to grow up and "be part of successful families," as opposed to what he called "these rainbow lifestyles."

180.    Kevin Bennett regarded the removal of funding as the "tamest slap on the wrist" and hoped it would motivate the library system to make better decisions on its own.[15]

181.    At a budget hearing on June 20, 2022, the Commissioners reinstated the funds for Wright Branch but declined to do the same for Campbell Branch.

182.    Protestors, including Kevin Bennett, had pushed for Wright Branch to retain its funding because, unlike the Campbell Branch, the Wright Branch did not have "bad books" in its collection.

183.    By August 2022, four Library Board positions became vacant.

184.    These positions were filled by the Commissioners, resulting in an almost entirely new board, with the exception of Charlie Anderson.

185.    The Board Members now included Sage Bear (Chair), Charles "Chuck" Butler (Vice Chair), Chelsie Collier (Treasurer), and Darcy Lyon.

186.    The newly appointed Board Members held beliefs that were aligned with those of the Commissioners and Bennetts.

187.    Between September 28 and 30, 2022, Library Board Chair Bear expressed to Denton Knapp, Commissioners Administrative Service Director, that she intended to revise the

---

[15] As with the above, such statements may be protected First Amendment speech standing alone but are being included in this Complaint not as evidence of unlawful behavior, but rather, as evidence of a discriminatory and political animus underlying the actions Defendants took against Ms. Lesley rather than any real belief that she and other library staff were acting unlawfully or subjecting children to criminal sexual misconduct.

Collection Development Policy with respect to how books were selected and retained at CCPLS and then fire Ms. Lesley.

188.    On June 8, 2023, the Library Board held a special Board Meeting, during which it approved highly subjective revisions to the Collection Development Policy.

189.    At the June 26, 2023, Library Board meeting—just eighteen days after the board approved the revisions—Ms. Bear asked Ms. Lesley for an update on removing books.

190.    Ms. Lesley simply stated that CCPLS had not received no challenges since the revisions to the policy were adopted.

191.    Ms. Bear responded that, "[t]here are a few titles that we're all very aware of and . . . I guess if you want them challenged we can certainly send the word out and I can start challenging them..."

192.    At the July 24, 2023, Library Board Meeting, Ms. Bear asked Ms. Lesley to move "certain books that are pretty obvious," "the egregious stuff," "that's easily meant more for an adult audience," "sexually explicit" using the weeding process.

193.    When Ms. Lesley mentioned that doing so would mean the library staff would be violating the First Amendment, Ms. Bear responded, "Well, if that's the way you feel then I feel like you should find another job."

194.    Board Members Butler requested a private meeting with Ms. Lesley to discuss the weeding process further.

195.    Board Chair Bear joined Board Member Bulter to meet with Ms. Lesley the following day.

196.    During the meeting, both Board Members asked Ms. Lesley to resign, citing her refusal to remove various unspecified books.

197.    Ms. Lesley refused to resign and asked for a public hearing.

198.    On July 28, 2023, Ms. Lesley was terminated in a 4:1 vote for refusing to remove books, ending her twenty-seven years of service and devotion to her beloved library and its community.

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1985(3)**
**Ku Klux Klan Act**
**(Against All Defendants)**

199.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

200.    Defendants plotted, coordinated, and executed a common plan with each other and with certain Campbell County Commissioners and Campbell County Library Board Members to engage in obstruction, intimidation, and threats against those who disagreed with their agenda to marginalize and harm LGBTQ+ community members and remove LGBTQ+ themed or content-including books from the library system, in violation of the rights of Ms. Lesley and other protected persons.

201.    Ms. Lesley has been subjected to a violation of her constitutional rights for her advocacy and association with LGBTQ+ people.

202.    The law "protects individuals who, though not members of a protected class, are "victims of discriminatory animus toward [protected] third persons with whom the individuals associate." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009); *see also Sines v. Kessler*, 558 F. Supp. 3d 250 (W.D. Va. 2021) (finding Charlottesville rally participants presented sufficient evidence of defendant supremacy group members' generalized desire to commit racial violence to survive summary judgement).

203.   In furtherance of their conspiracy to deprive Plaintiff and others of equal protection or equal privileges and immunities, Defendants engaged in acts of intimation and threats.

204.   Each Defendant committed an overt act in furtherance of the conspiracy to violate Plaintiff's rights, including, but not limited to falsely accused Plaintiff of engaging in criminal misconduct, accusing her of repeatedly of "harming children" or pushing "pornography" on children, reporting her to the police, and plotting for her termination with government officials.

205.   The illegal activities described above were undertaken by Defendants as overt acts pursuant to an unlawful conspiracy, the purpose of which was and is to oppress the LGBTQ+ community and their allies, subject such individuals to harassment and stigma, and to remove books from the library containing LGBTQ+ content or voices in violation of the rights guaranteed by the Constitution and laws of the United States.

206.   The conspiracy was motivated by a class-based invidious discriminatory animus.

207.   The conspiracy was aimed at interfering with rights that by definition are protected against private, as well as official, encroachment.

208.   As a result of Defendants' conduct, Plaintiff suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF
### Civil Conspiracy
### (Against All Defendants)

209.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

210.   As stated above, Defendants had an agreement and understanding to engage in, promote, and incite harassment of anyone who opposed their campaign to suppress diverse voices.

211.    Defendants did so silence anyone who opposed their efforts to deny the LGBTQ community the equal privileges and immunities of citizenship, and the use, benefits and privileges of property and/or contractual relationships.

212.    Defendants by words or conduct, worked together to accomplish an unlawful goal or to accomplish a goal through unlawful means.

213.    One or more unlawful acts were performed to accomplish the goal or one or more acts were performed to accomplish the unlawful goal.

214.    As a result of Defendants' conduct, Plaintiff suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

### THIRD CLAIM FOR RELIEF
**Defamation**
**(Against Defendants Hugh Bennett and Susan Bennett)**

215.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

216.    Having no reasonable legal bases to do so, Defendants filed a criminal complaint against the Plaintiff, stating, among other things that the Plaintiff is guilty of criminal offense and sexual misconduct as a result of including certain works of literature in the CCPLS library collection.

217.    Defendants publicly admitted that they would not have filed a criminal complaint against Plaintiff had she complied with their demands.

218.    When Defendants publicly admitted that they would not have filed the criminal complaint against Plaintiff had she complied with their demands, they also publicly admitted that

they accused Plaintiff of criminal conduct without a reasonable legal basis to blackmail or extort her.

219.    Defendants either knew the disparaging statements they published about Plaintiff were false or recklessly disregarded whether their statements were true when they published them.

220.    As a result of the Defendants' conduct, Plaintiff suffered damages to her reputation, actual economic damages and other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## FOURTH CLAIM FOR RELIEF
### Defamation
### (Against all Defendants)

221.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

222.    Defendants made false and defamatory communication concerning Plaintiff.

223.    Before October 27, 2021, Defendants had no reasonable basis to accuse Plaintiff of the crimes they accused Plaintiff of committing.

224.    After October 27, 2021, Defendants knew their allegations that Plaintiff had committed the crimes they accused Plaintiff of committing were false because they knew those accusations had no reasonable basis in law or fact.

225.    Defendants either knew the disparaging statements they published about Plaintiff were false or recklessly disregarded whether their statements were true when they published them.

226.    The statements include but are not limited to accusing the Plaintiff of "child abuse," "pornography," and "felonious conduct."

227.     As a result of the Defendants' conduct, Plaintiff suffered damages to her reputation, actual economic damages and other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## FIFTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress/ Outrageous Conduct
### (Against all Defendants)

228.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

229.     Defendants engaged in extreme and outrageous conduct over a period of almost two years, subjecting Plaintiff to a constant barrage of toxic, harmful, unlawful, threatening statements.

230.     The Defendants' conduct was done recklessly and with the intent of causing the Plaintiff severe emotional distress.

231.     Defendants knew or should have known that their conduct would cause the Plaintiffs emotional distress.

232.     As a result of the Defendants' conduct, Plaintiff suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering.

233.     Defendants' conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct, such that Plaintiff notifies Defendants that she intends to move for punitive damages.

### SIXTH CLAIM FOR RELIEF
### Abuse of Process
### (Against Hugh and Susan Bennett)

234.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

235.    Defendants' filing of a criminal complaint against the Plaintiff is a misuse of the legal process.

236.    Defendants' motive in filing the complaint was to use it for an ulterior purpose that is not proper in the regular conduct of legal proceedings.

237.    As a result of Defendants' conduct, Plaintiff suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Lesley respectfully requests that this Court enter judgment in his favor and against Defendants, and award her all relief as allowed by law, including but not limited to the following:

a.    All declaratory relief and injunctive relief, as appropriate;

b.    Actual economic damages, including but not limited to back pay, font pay, and lost benefits, as established at trial;

c.    Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

e.    Punitive damages for all claims as allowed by law, to the maximum amount permitted and in an amount to be determined at trial;

f.    Exemplary damages for all claims as allowed by law, to the maximum amount permitted and determined at trial

g.    Prejudgment and post-judgment interest at the highest lawful rate;

g.      A tax-offset;

h.      Attorneys' fees and costs; and

h.      Such further relief as justice requires.


Date: September 27, 2023

/s/ Qusair Mohamedbhai
Qusair Mohamedbhai
Iris Halpern*
Azra Taslimi*
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street
Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
qm@rmlawyers.com
ih@rmlawyers.com
at@rmlawyers.com
Attorneys for Plaintiff

* Pro Hac Vice Application Pending