Iris Halpern*
Azra Taslimi*
Qusair Mohamedbhai
Rathod | Mohamedbhai LLC
2701 Lawrence Street
Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
ih@rmlawyers.com
at@rmlawyers.com
qm@rmlawyers.com
*Attorneys for Plaintiff*

*\* Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | | |
|---|---|---|
| TERRI LESLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 23-cv-00177-ABJ |
| | ) | |
| | ) | |
| HUGH BENNETT, SUSAN BENNETT, | ) | |
| AND KEVIN BENNETT, | ) | |
| | ) | |
| Defendants. | ) | |

---

## RESPONSE TO MOTION TO DISMISS

---

Iris Halpern (Pro Hac Vice)
Colorado Bar Number: 53112
Rathod | Mohamedbhai LLC
2701 Lawrence St.
Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (3030 587-4401
Email: ih@rmlawyers.com
*Attorney for Plaintiff*

## TABLE OF CONTENTS

Introduction ................................................................................................................ 8

Additional Background Facts ...................................................................................... 8

Legal Argument ......................................................................................................... 11

    I.    Defendants Violated 42 U.S.C. § 1985 Otherwise Known as the Ku Klux Klan Act. ...... 12

        a.    Plaintiff Has Pled Class-Based Animus Under 42 U.S.C. 1985(3) ............................... 13

        b.    Defendants Wrongly Equate the Fourteenth Amendment with Section 1985. .............. 17

        c.    Plaintiff's Rights Have Been Violated Because Defendants Pressured Public Officials to Intervene and Hinder Constitutional Rights Which Resulted in Injury. .............................. 20

    II.    Defendants Engaged in an Unlawful Civil Conspiracy. ..................................................... 22

    III.    Defendants Made Injurious Falsehoods That Caused Plaintiff Pecuniary Harm. .......... 24

        a.    Plaintiff's Injurious Falsehood Claims Are Not Time Barred. ..................................... 24

        b.    Plaintiff is Not a Public Figure but Has Nevertheless Pled Facts Showing Malice. ...... 27

    IV.    The First Amendment Does Not Protect Defendants' Misconduct .............................. 30

    V.    Plaintiff has Sufficiently Pled That Defendants Imposed Extreme Emotional Distress .... 34

    VI.    Defendants Engaged in Abuse of Process by Reporting Ms. Lesley to the Police. ....... 37

        a.    Plaintiff's Abuse of Process Claim is Not Time-Barred. ............................................ 37

        b.    Plaintiff has Pled Sufficient Facts to Establish an Abuse of Process Took Place. ......... 38

CONCLUSION ........................................................................................................... 39

<u>T<small>ABLE OF</small> A<small>UTHORITIES</small></u>

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)........................................................................... 18

*Akron Bd. of Ed. v. State Bd. of Ed. of Ohio*, 490 F.2d 1285 (6th Cir. 1974)............................... 15

*Anaya v. CBS Broad. Inc.*, 626 F. Supp. 2d 1158 (D.N.M. 2009)................................................. 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 11

*Bankwest v. Fid. & Deposit Co. of Maryland*, 63 F.3d 974 (10th Cir. 1995)............................... 24

*Baron v. Carson*, 410 F. Supp. 299 (N.D. Ill. 1976) ................................................................... 22

*Batson v. Time, Inc.,* 298 So. 2d 100 (La. App. 1st Cir. 1974)..................................................... 34

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 11, 12

*Bennett v. Pace*, 731 P.2d 33 (Wyo. 1987)................................................................................... 25

*Bevin v. Fix*, 42 P.3d 1013 (Wyo. 2002)....................................................................................... 35

*Board of Education, Island Trees Union Free District No. 26 v. Pico*, 457 U.S. 853 (1982)  . 30, 31

*Bostock v. Clayton County, Georgia*...................................................................................... 14, 19

*Brewer v. Hoxie School District* is instructive here. 238 F. 2d 91 (8th Cir. 1956)..... 16, 20, 21, 32

*Brown v. Reardon*, 770 F. 2d 896 (10th Cir. 1985) ..................................................................... 19

*Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711 (9th Cir. 1981) ...................... 22

*Carson v. Allied News Co.*, 529 F.2d 206 (7th Cir.1976)............................................................. 34

*Cartwright v. Colorado Bank of Walsh, Inc.*, 658 F. Supp. 240 (D. Colo. 1987) ....................... 26

*Chancellor v. City of Detroit*, 454 F. Supp. 2d 645 (E.D. Mich. 2006)....................................... 38

*Christian v. Loyakk, Inc.*, 650 F. Supp. 3d 1242 (D. Wyo. 2023) ............................................... 11

*Clemmons v. Congress of Racial Equality*, 201 F. Supp. 737 (E.D. La. 1962) ...................... 21, 32

*Consumers Filling Station Co. v. Durante*, 333 P.2d 691 (1958) ................................................ 37

*Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967) ........................................................................ 27, 34

*Dias v. Denver*, 567 F.3d 1169 (10th Cir. 2009) ............................................................................ 11

*Downie v. Powers*, 193 F. 2d 760 (10th Cir. 1951) ........................................................................ 18

*Examination Bd. of Pro. Home Inspectors v. Int'l Ass'n of Certified Home Inspectors*, 519 F.

Supp. 3d 893 (D. Colo. 2021) ...................................................................................................... 25

*Farm Bureau Life Ins. Co. v. Am. Nat. Ins. Co.*, 505 F. Supp. 2d 1178 (D. Utah 2007) .............. 26

*Fayetteville Pub. Library v. Crawford Cnty., Arkansas*, 5:23-CV-05086, 2023 WL 4845636

(W.D. Ark. July 29, 2023) ............................................................................................................ 31

*Full Draw Prods. v. Easton Sports, Inc.*, 85 F. Supp. 2d 1001 (D. Colo. 2000) ........................... 26

*Gallagher v. Neil Young Freedom Concert*, 49 F. 3d 1995 (10th Cir. 1995) .............................. 18

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ........................................................................ 27

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 4:23-CV-00474, 2023 WL 9052113 (S.D.

Iowa Dec. 29, 2023) ...................................................................................................................... 31

*Glenn v. Brumby*, 663 F. 3d 1312 (11th Cir. 2011) ...................................................................... 14

*Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.,* 708 F.2d 944 (5th Cir.

1983) .............................................................................................................................................. 34

*Griffin v.* Breckenridge, 403 U.S. 88 (1971) ................................................................. 13, 18, 19

*Griffon v. Cong. of Racial Equal.*, 221 F. Supp. 899 (E.D. La. 1963) ......................................... 33

*Harte-Hanks Communications v. Connaughton*, 491 U.S. 657 (1989) ........................................ 33

*Hatch v. State Farm Fire & Cas. Co.*, 930 P.2d 382 (Wyo. 1997) ........................................ 35, 36

*Hecox v. Little*, 79 F. 4th 1009 (9th Cir. 2023) .......................................................................... 19

*Hill v. Stubson*, 420 P.3d 732 (Wyo. 2018) ................................................................. 29

*Idaho Norland Corp. v. Caelter Industries, Inc.,* 509 F. Supp. 1070 (D .Colo. 1981)) ............... 26

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848 (10th Cir.

1999) .................................................................................................................. 28

*Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.*, 968 F.2d 286 (2d Cir.

1992) .................................................................................................................. 32

*Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000) .................................................. 15

*Jones v. Slay,* 61 F. Supp. 3d 806 (E.D. Mo. 2014) ........................................................... 38

*Kanzler v. Renner*, 937 P.2d 1337 (Wyo. 1997) ............................................................... 35

*Khalik v. United Air Lines*, 671 F.3d 1188 (10th Cir. 2012) .................................................... 11

*Larson v. Miller*, 55 F.3d 1343 (8th Cir. 1995) ................................................................ 19

*Leithead v. Am. Colloid Co.*, 721 P.2d 1059 (Wyo. 1986) .................................................... 34

*Lewis v. News-Press & Gazette Co.*, 782 F. Supp. 1338 (W.D. Mo. 1992) ................... 21, 23, 34

*Little v. Llano County*, Civ. No. 1:22-CV-424-RP, 2023 WL 2731089 (W.D. Tex. Mar. 30, 2023)

.......................................................................................................................... 31

*Love v. Bolinger*, 927 F. Supp. 1131 (S.D. Ind. 1996) ........................................................ 22

*Loya v. Wyoming Partners of Jackson Hole, Inc.*, 35 P.3d 1246 (Wyo. 2001) .......................... 36

*Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332 (11th Cir. 1999) ........................................ 14

*MacGuire v. Harriscope Broadcasting Co.*, 612 P.2d 830 (Wyo. 1980) .................................... 31

*Martin v. Comm. for Honesty & Just. at Star Valley Ranch*, 101 P.3d 123 (Wyo. 2004) ...... 27, 28

*McGlory v. Bohlender*, No. Civ. A. 93-2206-EEO, 1994 WL 326022 (D. Kan. June 15, 1994) . 38

*McHale v. Lake Charles American Press,* 390 So.2d 556 (La.App.3d Cir. 1980) ...................... 34

*Nat'l Abortions Fed. v. Operation Rescue*, 8 F.3d 680 (9th Cir. 1993)) ................................... 20

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ......................................... 28, 30, 31, 32, 34

*Painter v. Wells Fargo Bank, N.A.*, No. 1:07-CV-0395 MCA/ACT, 2008 WL 11411979 (D.N.M.

    Feb. 29, 2008) ........................................................................................................ 39

*Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208 (8th Cir. 1972) ......................... 15

*Pitts v. City of Cuba*, 913 F. Supp. 2d 688 (E.D. Mo. 2012) ........................................................ 38

*Ralston v. Garabedian*, 623 F. Supp. 3d 544 (E.D. Pa. 2022) ...................................................... 33

*Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126 (10th Cir. 2010) ................... 15

*Richardson v. Miller*, 446 F. 2d 1247 (3rd Cir. 1971) ................................................................. 15

*Rinsley v. Brandt*, 446 F. Supp. 850 (D. Kan. 1977) ................................................................... 26

*Seamster v. Rumph*, 698 P.2d 103 (Wyo. 1985) ......................................................................... 37

*Shanley v. Hutchings*, Civ. No. 222-cv-00549, 2024 WL 496250 (D. Utah Feb. 8, 2024) .......... 25

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ....................................................................................... 18

*Shriners Hosps. for Crippled Child., Inc. v. First Sec. Bank of Utah, N.A.*, 835 P.2d 350 (Wyo.

    1992) .................................................................................................................... 23

*Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004) ....................................................... 14

*Sweetwater Station, LLC v. Pedri*, 522 P.3d 617 (Wyo. 2022) ................................................... 24

*The Tavern, LLC v. Town of Alpine*, 395 P.3d 167 (Wyo. 2017) ................................................ 37

*Thomas v. Sumner*, 341 P.3d 390 (Wyo. 2015) ........................................................................... 28

*Tilton v. Richardson*, 6 F. 3d 683 (10th Cir. 1993) .................................................................. 13, 18

*Toltec Watershed Imp. Dist. v. Johnston*, 717 P.2d 808 (Wyo. 1986) ...................................... 37, 38

*Trautz v. Weisman*, 819 F. Supp. 282 (S.D.N.Y. 1993) .............................................................. 19

*United Brotherhood of Carpenters v.* Scott, 463 U.S. 825 (1983) ........................................... 13, 18

*Volk v. Coler*, 845 F.2d 1422 (7th Cir. 1988) .............................................................................. 14

*Waller v. Butkovich*, 584 F. Supp. 909 (M.D.N.C. 1984)............................................................. 15

*White v. Shane Edeburn Const., LLC*, 285 P.3d 949 (Wyo. 2012)............................................... 22

*Wilder v. Cody Country Chamber of Com.*, 868 P.2d 211 (Wyo. 1994) ....................................... 36

*Wilhelm v. Continental Title Co.*, 720 F. 2d 1173 (10th Cir. 1983) ............................................. 19

*Williams v. Burns*, 540 F. Supp. 1243 (D. Colo. 1982) ........................................................ 25, 26

*Windsor v. The Tennessean*, 719 F.2d 155 (6th Cir. 1983) .......................................................... 22

*Wolford v. Lasater*, 78 F.3d 484 (10th Cir. 1996) ....................................................................... 37

*Worley v. Wyoming Bottling Co.*, 1 P.3d 615 (Wyo. 2000)........................................................... 35

*Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066 (5th Cir. 1987)................................... 29, 31, 34

*Zhang Jingrong v. Chinese Anti-Cult World All.*, 287 F. Supp. 3d 290, (E.D.N.Y. 2018) .......... 20

**Statutes**

Wyo. Stat. § 1-3-105(a)(iv)(C) ............................................................................................. 26, 38

Wyo. Stat. § 1-3-105(a)(v)(A) ................................................................................................... 26

Wyo. Stat. § 1-3-105(a)(v)(C) ................................................................................................... 38

42 U.S.C. § 1983.........................................................................................................Various

42 U.S.C. § 1985.........................................................................................................Various

**Secondary Sources**

Anatomy of an Affirmative Duty to Protect: 42 U.S.C. Section 1986, 56 Wash. & Lee L. Rev.

461, 471 (1999)......................................................................................................... 17

11 American Law of Torts § 33:3 ............................................................................... 26

**INTRODUCTION**

This case is about a multi-year campaign by Defendants Hugh, Susan, and Kevin Bennett to destroy Plaintiff Terri Lesley because she opposed their discriminatory and repressive political agenda. Not only did Defendants maliciously trammel roughshod over Ms. Lesley's constitutional and statutory rights, but they did so solely and with the intent to exclude LGBTQ+ community members from the library district and to censor books by these and other minority voices. Defendants publicly accused Ms. Lesley of being a "pervert," committing "criminal offenses," engaging in "illegal activity," "sexual intrusion," "child neglect," "child abuse," and violating "state criminal statutes in Wyoming" by providing "porn to kids." Defendants publicly vociferated that Ms. Lesley violated Wyoming's rape laws. Defendants tried to have Ms. Lesley arrested by the Campbell County Sheriff's Office, falsely accusing her of "felonious behavior," engaging in "obscenity and solicitation of minors," and exposing children to "horrible, vile, erotic content unfit for children," and "hard-core pornography." Even after several legal opinions cautioned them otherwise, Defendants continued to engage in injurious falsehoods, abuse, harass, and retaliated against Plaintiff. Now they seek to avoid any accountability for those actions. Ms. Lesley has filed a detailed forty-two-page Amended Complaint with nearly two hundred factual allegations. Given the adequacy of that Complaint, Defendants' Motion to Dismiss must be denied in total.

**ADDITIONAL BACKGROUND FACTS**

Plaintiff filed her original Complaint on September 27, 2023. She filed her Amended Complaint to fix several non-substantive minor errors on October 16, 2023. In her Amended Complaint, Plaintiff articulated 190 paragraphs (approximately 32 pages) of non-jurisdictional well pled facts. As evident from the Amended Complaint, Defendants were incessant in their

statements and actions, and freely opined on their motives. Hence, the statements and actions described in Plaintiff's Amended Complaint are taken from well-documented public hearings, legal memorandum, and even newspaper articles Defendants themselves published. However, Defendants downplay or ignore all these well-pled facts in their Motion to Dismiss, including:

- In ¶¶ **50-57, 59**, factual allegations including statements made by the Bennetts intending to show their malicious motive and true reasons for falsely accusing Ms. Lesley of crimes, spreading injurious falsehoods about her, and intentionally inflicting emotional distress upon her, namely, to exert pressure on her to remove literature with LGBTQ+ and other themes and voices they wish to have banned from public access. The Bennetts and those they recruited to protest such community members and literature explicitly peddled stereotypes and vilified LGBTQ+ individuals, associating them with criminal misconduct like "pedophilia" and "child molestation," and demanded the books be removed from library access to which certain Commissioners begin to countenance.

- In ¶¶ **79-86**, factual allegations including statements made by the Bennetts showing their malicious motive and true reason for falsely accusing Ms. Lesley of "lying," "grooming," and "perverting" children because the library district had contracted with a transgender magician for one show, as well as showing collusion with others in the community including several County Commissioners.

- In ¶¶ **87-97**, factual allegations including statements made by the Bennetts establishing their malicious motive and true reasons for falsely accusing Ms. Lesley of crimes, further defaming her, and intentionally inflicting emotional distress upon her in the name of their political agenda, including statements taken from Hugh Bennett's own publication *Anybody's Audo*, in which Defendants brag about stopping the transgender magician show, accused Ms. Lesley of lying and "targeting children," and acknowledged that the tactics they were using were not conceived originally by them, but were developed by a national organization, MassResistance, that disseminated a blueprint for activists to effectively pressure librarians into banning books.

- In ¶¶ **98-99, 106-121**, factual allegations and statements made by the Bennetts in public hearings and by taking public actions showing their malicious motive and true reasons for falsely accusing Ms. Lesley of crimes, defaming her, and intentionally inflicting emotional distress upon her all in the name of furthering a political agenda by colluding with and organizing their supporters using nationalized tactics to accuse Ms. Lesley of violating rape laws, engaging in "illegal activity," "encourage[ing] sexual intrusion," and committing "criminal offenses," "putting children in danger," "child neglect," and "bringing gay porn to kids."

- In ¶¶ **122-136**, factual allegations and statements made by Hugh and Susan Bennett in public hearings and at the Cambell County Sheriff's Office where they accused her of

felonious behavior in the attempt to have her arrested because she would not remove books they disfavored from the library shelves, including where they accused Ms. Lesley of exposing children to "horrible, vile, erotic content," that included "hard-core pornography," "obscenity and solicitation of minors," and "felonious conduct," and admitted that the only reason they did so was to force Ms. Lesley to capitulate to censoring and removing books. Defendants also further called for Ms. Lesley's termination and accused Ms. Lesley of "child abuse" and disseminating "pornography" in public hearings and continued to call for her arrest on the basis of "obscenity and solicitation of crimes."

- In ¶¶ **136-150**, factual allegations about a legal opinion issued by the County Attorney warning Defendants that Ms. Lesley was not violating state or federal laws; allegations demonstrating the Bennetts ignored those warnings, including Hugh Bennett testifying he was "not going to change my mind because of something a lawyer chooses to do or not do"; and allegations demonstrating that even after these legal opinions, Defendants accused Ms. Lesley of "encouraging and/or enticing minor sexuality [which is] a crime," and encouraging others to threaten and harass Ms. Lesley.

- In ¶¶ **159-172**, factual allegations about a two additional legal opinions, including one by the Campbell County Deputy County and Prosecuting Attorney and a private firm hired by the Library Board that further confirmed that censoring or removing primarily LGBTQ+ books would be a violation of the freedom of speech, religion, and due process, with particularly emphasis on the First Amendment, further consolidating Ms. Lesley's position that she was not engaging in criminal misconduct, but which Defendants continued to intentionally ignore, including Hugh Bennett yet again denouncing "illegal activity at the library," accusing Ms. Lesley of "being porn-friendly to kids," and launching additional book challenges.

- In ¶¶ **177-182**, factual allegations establishing Kevin Bennett's malicious motives and true reason for falsely accusing Ms. Lesley of crimes, defaming her, and intentionally inflicting emotion distress upon her, and colluding with others to harass her, including statements in public hearings of his dislike of "rainbow lifestyles," and "bad books."

ECF No. 13, *Amended Complaint*, at 10-36. These facts are all relevant to the claims brought by Ms. Lesley, as are other facts about Ms. Lesley's termination, given that, although the Library Board terminated Ms. Lesley, allegations throughout the Amended Complaint demonstrate how Defendants colluded between themselves and with other individuals in the community and certain public officials to effectuate their political goals at Ms. Lesley's expense.

In response to Defendants' Motion to Dismiss, on February 14, 2024, Plaintiff filed a Motion for Leave to File Amended Complaint. Plaintiff included additional facts about

harassment, collusion, and her emotional distress and clarified her legal theories and claims. *See* ECF No. 30, *Motion for Leave to Amend*; ECF No. 31-1, *Second Amended Complaint Redlined*, 10, 20-21, 23, 26, 31, 33, 36, 38-46. Although these changes were in the effort to allay Defendants' criticisms and critiques of her Amended Complaint, Defendants opposed the changes.

## LEGAL ARGUMENT

As an initial matter, Federal Rule of Civil Procedure 12(b)(6) motions for dismissal of a claim must take into account the minimal notice pleading standard of Federal Rule 8. *Christian v. Loyakk, Inc.*, 650 F. Supp. 3d 1242, 1266 (D. Wyo. 2023). Those pleading standards require only "a short and plain statement of the claim showing that the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the. . . claim is and the grounds upon which it rests." *Id.* (internal quotations omitted). As such, "granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

In assessing a Rule 12(b)(6) motion, courts must treat all well-pleaded allegations in the complaint as true, and any reasonable inferences arising from them must be construed in the light most favorable to the plaintiff. *Id.* To survive a motion to dismiss, a complaint need only contain sufficient factual matter, which if accepted as true, "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556. The plausibility standard "does not require that [the] [p]laintiff establish a prima facie case in the complaint." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192

(10th Cir. 2012). And of course, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable and that a recovery is very remote and unlikely." *Twombly,* 550 U.S. at 556.

Notwithstanding the highly detailed Amended Complaint filed by Plaintiff, much of which relies on well-documented actions and statements made publicly by Defendants, they still argue that Plaintiff has failed to state a single claim against them. Given the extensive record of well-pled facts, and the important public interests at stake, fulsome discovery is warranted, and Defendants arguments must be categorically rejected.

## I.      Defendants Violated 42 U.S.C. § 1985.

Defendants argue that Plaintiff fails to make out a 42 U.S.C. § 1985 claim because Plaintiff: (1) does not claim to be part of a protected class; and (2) cannot establish her rights were violated, particularly not against private enforcement. ECF No. 24, *Motion to Dismiss*, at 8-12 (arguing Plaintiff's civil conspiracy claims fail for much the same reason). Both these arguments rest upon the faulty assumption that a plaintiff must possess these protected characteristics personally to proceed on a claim, and that sexual orientation and gender identity are not constitutionally protected. Plaintiff's 42 U.S.C. § 1985(3) claim is complex because courts have "imputed" the protected characteristics of the victim class to their advocate for purposes of an adverse action. This legal framework has long been recognized by the courts in the context of race, sex, disability, and other protected characteristics. And recently, the Supreme Court confirmed that sexual orientation and gender identity are protected classes within federal civil rights laws, and so the same logic applies. Defendants have also violated Plaintiff's rights by interfering with the performance of her duties in violation of 42 U.S.C. § 1985(3) which prohibits "preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons

within such State or Territory the equal protection of laws." In the same vein, by interfering with the performance of her job duties for the purpose of depriving individuals of equal protection of laws because of their protected classes, Defendants have violated 42 U.S.C. § 1985(1).

### a. *Plaintiff Has Pled Class-Based Animus Under 42 U.S.C. 1985(3).*

As an initial matter, the essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff(s) of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom. *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993). Further parsing the elements of the claim, the Supreme Court in *Griffin v. Breckenridge* clarified that "there must be some. . . class-based, invidiously discriminatory animus behind the conspirators' action." 403 U.S. 88, 102 (1971). Section 1985(3) applies to both public official and private conspiracies. *Id.* at 100. The *Griffin* Court, in describing revisions made to the Section in previous decades, explained that "[t]he enormous sweep of the original language led to pressures for amendment, in the course of which the present civil remedy was added. . . **there was no suggestion whatever that liability would not be imposed for purely private conspiracies**…**It is thus evident that all indicators—text, companion provisions, and legislative history—point unwaveringly to s 1985(3)'s coverage of private conspiracies.**" *Id.* at 100-01 (emphasis added). On its face, Section 1985(3) seeks to protect individuals from the deprivation of equal protection of the laws. It makes no difference that 42 U.S.C. 1983 is limited to states, Section 1985 is not so narrowly circumscribed. The Supreme Court, reiterating the holding of *Griffin*, stated in *United Brotherhood of Carpenters v. Scott* that "[n]either is respondents' position helped by the assertion that even if the Fourteenth Amendment does not provide authority to proscribe exclusively private conspiracies, precisely the same conduct could be proscribed by the Commerce Clause. . .The Court of Appeals accordingly erred

in holding that § 1985(3) prohibits wholly private conspiracies[.]" 463 U.S. 825, 833 (1983) (also explaining that, in addition, "Section 1985(3) constitutionally can and does protect [Thirteenth Amendment] rights from interference by purely private conspiracies.").

Also relevant, Section 1985(3) claims extend beyond conspiracies to discriminate against persons based on race to conspiracies to discriminate against persons based on "sex." *Volk v. Coler*, 845 F.2d 1422, 1434 (7th Cir. 1988) (citing cases); *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1336-39 (11th Cir. 1999) (confirming women are a protected class under Section 1985). The Supreme Court in *Bostock v. Clayton County, Georgia* held that sexual orientation and gender identity are also characteristics protected against discrimination under prohibitions on sex discrimination. In no uncertain terms, "to discriminate against employees for being homosexual or transgender, [a person] must intentionally discriminate against individual men and women in part because of sex." 140 S. Ct. 1731, 1743 (2020). In other words, "[a]n employer who fires an individual merely for being gay or transgender defies the law." *Id.*; *see also Glenn v. Brumby*, 663 F. 3d 1312, 1317 (11th Cir. 2011) ("[D]iscrimination against a transgender individual because of her gender-nonconformity is sex discrimination [under 42 U.S.C. 1983], whether it is described as being on the basis of sex or gender. Indeed, several circuits have so held."); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 578 (6th Cir. 2004) (plaintiff successfully stated a claim for relief under Title VII and 42 U.S.C. § 1983 in alleging sex discrimination based on her transgender status).

Finally, federal courts have long imputed the protected characteristics of victims of discriminatory animus to plaintiffs associated with, or who advocated for, the protected class but subsequently suffered an adverse action. So, for example, where an individual advocates for a women, people or color, or persons with disabilities, and finds themselves subjected to an adverse action, courts have recognized the violation of that individual's federal civil rights. *See Johnson v.*

*Univ. of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000) (holding that high-level white admissions officer at university had standing to bring a discrimination claim based on his advocacy for affirmative action or women and racial minorities); *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1132 (10th Cir. 2010) (speech-language pathologist's advocacy on behalf of her disabled students sufficient to support a retaliation claim under Section 504 of the Rehabilitation Act). Courts have explicitly articulated this relationship under Section 1985. In *Richardson v. Miller* the Third Circuit reversed revived plaintiff's Section 1985(3) claim after the plaintiff – not a member of the protected class – alleged he was fired for opposing hiring practices implemented by his employer limiting hiring to whites, and for advocating for political candidates who sought to limit such practices. 446 F. 2d 1247, 1248-49 (3rd Cir. 1971); *see also Waller v. Butkovich*, 584 F. Supp. 909, 936-37 (M.D.N.C. 1984) (confirming that when Congress passed Section 1985, it intended to support not only Black citizens but "advocates of equal rights" and "those that support them."). Courts have also historically recognized the standing of individuals generally to bring suits who are closely associated with individuals whose rights have been violated. *See Akron Bd. of Ed. v. State Bd. of Ed. of Ohio*, 490 F.2d 1285, 1289 (6th Cir. 1974) ("Where, however, there is a close relationship between the plaintiffs who seek to bring an action and the class of persons whose constitutional rights are claimed to be violated, standing to sue has frequently been found."); *Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208, 1213 (8th Cir. 1972) ("Though generally speaking, the right to equal protection is a personal right of individuals, this is 'only a rule of practice'…which will not be followed where the identity of interest between the party asserting the right and the party in whose favor the right directly exists is *sufficiently close*." (quotation omitted).

Sexual orientation and gender identity are protected characteristics imputed to Plaintiff, and harassment, attempts to arrest her, and the loss of her employment based on her advocacy and association with these protected classes violated Plaintiffs' rights. The Section 1985 case *Brewer v. Hoxie School District* is instructive here. 238 F. 2d 91 (8th Cir. 1956). As far back as 1956, courts recognized the importance of protecting public employees from the organized animus of private actors seeking to force public institutions to perpetuate discrimination. In that case, the Eighth Circuit issued an injunction against certain private individuals and organizations espousing segregationist views after directors and superintendents of the school district brought suit against Defendants for "commit[ing] numerous acts of trespass upon the school property and acts of annoying, threatening, and intimidating the individual plaintiffs, and made inflammatory speeches at mass meetings condoning physical violence and calling for mass action in resistance to desegregation, and to the same end made threats to boycott the schools and to subject the members of the school board to endless, expensive litigation, and attempted by fear and persuasion to deter the children from attendance at schools of the district." *Id.* at 93-94.

Likewise, Defendants routinely colluded with others, harassed, and took actions against Ms. Lesley, with the sole intention of depriving LGBTQ+ individuals of their equal protection under the laws, and discriminated and retaliated against Ms. Lesley as a result of her association with, advocacy for, and refusal to discriminate against such individuals. Contrary to Defendants' assertions, Ms. Lesley frequently cites statements by Defendants "belittling or expressing ill will towards any member of the LGBTQ community." Defendants called such individuals and their existence perversions, pornography, dangerous, criminal, immoral, and a wide assortment of other derogatory and animus-filled characterizations, including spear-heading a campaign to end the contract with a transgender magician.

16

It was that animus that motivated the Defendants' campaign against Ms. Lesley. They harassed her, colluded and fomented others to do so, sought to deprive her of employment, and attempted to have her arrested because of their animus against this protected class. Ms. Lesley declined to censor books by LGBTQ+ authors, deprive LGBTQ+ constituents reading materials relevant to their lives and experiences, worked hard to make the public library open and accessible to all regardless of protected class, and opposed cancelling contracts with individuals merely because of their LGBTQ+ status, and for this Defendants targeted her rights. As a result, they have violated 41 U.S.C. § 1985(3).

### b. Defendants Wrongly Equate the Fourteenth Amendment with Section 1985.

Defendants argue that Ms. Lesley has neither identified a protected class nor articulated which of rights were violated and subject to private enforcement. *Motion to Dismiss*, at 13. As an initial matter, Ms. Lesley's Section 1985(3) claim on its face refers to "equal protection or equal privileges and immunities" pursuant to Fourteenth Amendment of the United States Constitution. *Amended Complaint*, at 203. Similarly, Section 1985(3) incorporates the parameters of the Equal Protection Clause of the Fourteenth Amendment, also referring to "equal protection of the laws, or of equal privileges and immunities under the laws." Indeed, it was to help newly emancipated Black citizens realize the rights enshrined in the Fourteenth Amendment that Congress enacted the Ku Klux Klan Act, including Section 1985. *See* Linda E. Fisher, *Anatomy of an Affirmative Duty to Protect: 42 U.S.C. Section 1986*, 56 Wash. & Lee L. Rev. 461, 471 (1999) (describing the historical context of the Ku Klux Klan Act of 1871). Congress intended for the Act to make meaningful the guarantees of the Fourteenth Amendment against both public and private encroachment, in particular the equal rights provisions. *Id*. at 472; *see generally Griffin,* 403 U.S. at 95 ("Congress certainly has the power to create a federal cause of action in favor of persons

injured by private individuals through the abridgment of federally created constitutional rights. It seems to me that Congress has done just this in § 1985(3). This is not inconsistent with the principle underlying the Fourteenth Amendment."); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 205 (1970) ("Stirred to action by the wholesale breakdown of protection of civil rights in the South, Congress carried to completion the creation of a comprehensive scheme of remedies — civil, criminal, and military — for the protection of constitutional rights from all major inference.") (concurring opinion). Thus, contrary to Defendants' claim that Plaintiff only vaguely refers to a "violation of the rights," in identifying Section 1985, Plaintiff has made those rights clear.

Defendants cite to such cases as *Shelley v. Kraemer*, 334 U.S. 1 (1948), to imply that Section 1985 requires state action. *Motion to Dismiss*, at 19. However, *Shelley v. Kraemer* makes no mention of Section 1985. Nor does *Gallagher v. Neil Young Freedom Concert*, a case also cited by Defendants which implicates only 42 U.S.C. § 1983 claims, and nowhere implies that merely private conduct is not actionable. *See* 49 F. 3d 1995, 1454 (10th Cir. 1995). Likewise, *Tilton v. Richardson*, 6 F.3d 683 (10th Cir. 1993) does not stand for the proposition that state action is required under Section 1985. To the contrary, the Tenth Circuit in cases like *Tilton* recognized private conspiracies as actionable. 6 F.3d at 686 ("…§ 1985(3) applies to private conspiracies only in the event that the right aimed at by the conspiracy is one protected against both public and private interference."). The single case Defendants rely on which does not recognize private conspiracies has been disapproved of by the Supreme Court in *Griffin*, *United Brotherhood of Carpenters*, and their progeny. *See Downie v. Powers*, 193 F. 2d 760, 765 (10th Cir. 1951) (relying on *Collins v. Hardyman*, 341 U.S. 651 (1951) disapproved of in *Griffin*, 403 U.S. at 101); *see United Brotherhood of Carpenters*, 463 U.S. at 832 ("This was a correct reading of the language of the Act; the section is not limited by the constraints of the Fourteenth Amendment.").

The cases cited by Defendants for the proposition that Plaintiff has not articulated a protected class are likewise dated following the decision in *Bostock*. After the *Bostock* decision, other courts have recognized gender identity as a protected class within the meaning of Fourteenth Amendment, which Section 1985 seeks to vindicate against private conspiring individuals. *See Hecox v. Little*, 79 F. 4th 1009, 1016 (9th Cir. 2023) (affirming district court's grant of preliminary injunction prohibiting transgender women from participating in female athletics). Defendants' citations to *Wilhelm v. Continental Title Co.*, 720 F. 2d 1173 (10th Cir. 1983) and *Brown v. Reardon*, 770 F. 2d 896 (10th Cir. 1985) thus hold no sway. Neither case discusses sexual orientation or gender identity discrimination, or even sex discrimination, all of which have been widely recognized as protected classes for which equal protection of laws applies. Indeed, *Wilhelm*, a disability discrimination case, is so dated that the decision precedes Congressional enactment of the Americans with Disabilities Act of 1990 and has been routinely questioned since then. *See, e.g.*, *Trautz v. Weisman*, 819 F. Supp. 282, 292-94 (S.D.N.Y. 1993) (discussing history of discrimination against individuals with disabilities, passage of the ADA, and "[f]inding that a class of disabled individuals may fall within § 1985(3)'s protective ambit does not clearly run afoul of the statute's express language or its present parameters. The statute's language does not expressly limit its application to cases of racial discrimination. We shall not graft such a limitation onto it."); *Larson by Larson v. Miller*, 55 F.3d 1343, 1352 (8th Cir. 1995) ("We believe that § 1985(3)'s protection extends to the handicapped as a class…"), rev'd on other grounds, 76 F.3d 1446 (8th Cir. 1996). Given the case law, Plaintiff has pled not only a protected class, but that she is entitled to benefit from it based on her association with, advocacy for, and opposition to discrimination against, such individuals.

### c. *Plaintiff's Rights Have Been Violated Because Defendants Pressured Public Officials to Intervene and Hinder Constitutional Rights Which Resulted in Injury.*

Section 1985(3) also prohibits conspiracies between private individuals who seek to "prevent[]or hinder[]the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws." Thus, "[i]f two or more persons in any State or Territory conspire ... for the purposes of ... preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws ... the party so injured or deprived may have an action for the recovery of damages...." *Zhang Jingrong v. Chinese Anti-Cult World All.*, 287 F. Supp. 3d 290, 300 (E.D.N.Y. 2018). A claim seeking relief for hinderance requires the following: (1) the conspirators must intend to interfere with state enforcement, not just to interfere with the persons seeking to exercise their legal rights; (2) the conspiracy must be directed at a protected class; and, (3) the conspiracy must implicate a constitutional right. *Id.* (quoting *Nat'l Abortions Fed. v. Operation Rescue*, 8 F.3d 680 (9th Cir. 1993)).

As Plaintiff described in her Amended Complaint, Defendants ceaselessly harassed, interfered with, and hampered the performance of official job duties because of their discriminatory animus and intent to deprive Plaintiff and others in the community of their constitutional rights, eventually resulting in her termination. The *Brewer* case, discussed *supra*, is again instructive here. In *Brewer*, the court noted that plaintiffs were bound by the Fourteenth Amendment to integrate the school district, and thus entitled to be free from direct interference in the performance of that duty. 238 F.2d at 98–99. Affirming the injunction against the private individuals and organizations agitating for segregation, the court noted that under Section 1985(3) "[t]hose acts and that type of speech were calculated and intended, at the times and under the

circumstances in which they were made, to incite disobedience of the law and the overthrow of law and order and to coerce, intimidate, and compel the school board to cease and desist from the performance of its sworn and lawful duty, and to engage in unlawful conduct." 238 F. 2d at 102; *see also Clemmons v. Congress of Racial Equality*, 201 F. Supp. 737, 750 (E.D. La. 1962) (recognizing standing of police officers and city officials to seek injunction under Section 1985(3) against private organization and its members from blocking streets as part of protests against discrimination because of "interference with those officials in the exercise of their official duties."). Like the defendants in *Brewer*, the Bennetts engaged in a ceaseless campaign of harassment and pressure on public officials to deprive minority community members of their equal protection of laws and injured Ms. Lesley after she refused to engage in unconstitutional practices. Thus, she has standing to seek redress under the hinderance clause of Section 1985(3).

Moreover, since Defendants filed their Motion to Dismiss, Plaintiff filed her Motion for Leave to Amend, (ECF. No. 30), including Section 1985(1) claims in her proposed new Complaint as well. *Second Amended Complaint*, at 40-42. Section 1985(1) prohibits conspirators that seek to "prevent, by force, intimidation, or threat, any person [holding office] from…discharging any duties thereof…or to injure [her] in [her] person or property on account of [her] lawful discharge of the duties of [her] office, or while engaged in the lawful discharge thereof, or to injure [her] property so as to molest, interrupt, hinder, or impede [her] in the discharge of [her] official duties." 42 U.S.C. § 1985(1). Although it is unclear whether municipal and state officials fall within the scope of redress under this provision, courts have nevertheless held that if an official does suffer defamatory statements and accusations of criminal misconduct, doing so may interfere with an official's job duties in violation of Section 1985(1). *See Lewis v. News-Press & Gazette Co.*, 782 F. Supp. 1338, 1341-42, 45-47 (W.D. Mo. 1992) (plaintiff state court judge sufficiently alleged

Section 1985(1) claims after alleging conspiracy to accuse him of crimes to impede his duties); *see also Windsor v. The Tennessean*, 719 F.2d 155, 162 (6th Cir. 1983) (disagreeing with district court that under Section 1985(1) that private parties who conspire to deliberately defame a public official in order to discredit that official is protected by the first amendment right to petition for redress of grievances). *But cf. Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 717 (9th Cir. 1981) (nothing in the language of the statute implies that Section 1985(1) does not apply exclusively to federal officers; *Love v. Bolinger*, 927 F. Supp. 1131, 1139 (S.D. Ind. 1996) (same); *Baron v. Carson*, 410 F. Supp. 299, 301 (N.D. Ill. 1976) (same)).

Here, Plaintiff was the Director of a public library district, a role which is tasked with serving the entire community equally, regardless of protected class. Either under Section 1985(1) or 1985(3), Defendants violated Ms. Lesley's rights by impeding the performance of her official duties, including by harassing her, seeking her arrest, subjecting her to litigation, publicly maligning her, accusing her of violating the law, and agitating for her termination.

## II.    Defendants Engaged in an Unlawful Civil Conspiracy.

In attempting to dismiss Ms. Lesley's conspiracy claims, Defendants briefly argue that Ms. Lesley failed to allege any unlawful act occurred, thus undermining her civil conspiracy claim. *Motion to Dismiss*, at 13. For the same reasons that Plaintiff has articulated a Section 1985(3) claims, she has also articulated a civil conspiracy claim under Wyoming state law – indeed conspiracy is a central component of both of these claims.

As Defendants state, under Wyoming law, a plaintiff alleging civil conspiracy must describe the following facts to survive a motion to dismiss: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate cause thereof." *White v. Shane Edeburn*

*Const., LLC*, 285 P.3d 949, 958 (Wyo. 2012). Civil conspiracy does not require an actual violation of anti-discrimination statutes, although these can serve as the basis for the underlying act, but also includes other deprivations of constitutional rights or state torts. *See Shriners Hosps. for Crippled Child., Inc. v. First Sec. Bank of Utah, N.A.*, 835 P.2d 350, 357 (Wyo. 1992) (involving conspiracy to commit fraud); *Lewis*, 782 F. Supp. at 1345 (finding plaintiff sufficiently pled conspiracy to defame him when defendants colluded to accuse him of a crime and published such accusations).

In her Amended Complaint, Plaintiff brought not only conspiracy to violate her constitutional rights under Section 1985, but she also pled injurious falsehood, emotional distress, and abuse of process claims. *Amended Complaint*, at 38, 42-3. Thus, on the Amended Complaint's face, Plaintiff has alleged underlying causes of action in tort sufficient to support a conspiracy claim. Furthermore, Plaintiff included factual allegations demonstrating the other elements of the claim, including that: (1) two or more Defendants, (2) with the object of coercing Ms. Lesley; (3) expressly and overtly colluded, (4) to defame her, deprive her of her constitutional rights, precipitate her arrest, end her employment, and cause her extreme emotional distress; (5) which caused Plaintiff damages. Hence, Ms. Lesley has sufficiently alleged a civil conspiracy.

Out of an abundance of caution, Plaintiff in her proposed Second Amended Complaint reiterated the nature of the conspiracy in the description of her claim. *See Second Amended Complaint Redlined*, at 43. However, in the current operative Complaint, she has identified underlying torts and shared sufficient facts supporting her conspiracy claim notwithstanding Defendants' critiques. Instead, Defendants artificially focus on the Fourteenth Amendment as the only basis of the claims, and then assert that because the Fourteenth Amendment requires state action it cannot serve as the basis of the state tort claim. *Motion to Dismiss*, at 13. Defendants cite

no legal authority to support their position. Not is the argument relevant, Ms. Lesley facially pled several other bases, and so Defendants call to dismiss this claim must be denied.

**III.    Defendants Made Injurious Falsehoods That Caused Plaintiff Pecuniary Harm.**

In her Amended Complaint, Plaintiff brought two claims of defamation. Defendants have argued that her defamation claims are: (1) time-barred; (2) Plaintiff has failed to plead actual malice; and, (3) that the Defendants' First Amendment rights preclude her claims. Plaintiff addresses each of these arguments in turn.

*a.  Plaintiff's Injurious Falsehood Claims Are Not Time Barred.*

Plaintiff concedes that as currently written in her Amended Complaint the basis of her defamation claims is unclear, hence leading Defendants to assume a one-year statute of limitations applies. However, as part of her efforts to confer - and as clarified in her proposed Second Amended Complaint - the claims Plaintiff pursues are those for "injurious falsehood." *Second Amended Complaint Redlined*, at 43-45. Injurious falsehood torts are separate and distinct from libel or slander claims, and thus a four-year statute of limitations under Wyoming law applies. In *Bankwest v. Fid. & Deposit Co. of Maryland*, the Tenth Circuit described the tort of injurious falsehood as such:

> There are several torts distinct from libel or slander that one might reasonably describe as the publication or utterance of defamatory or disparaging material. One such tort is 'called by various names such as 'disparagement of property,' 'slander of goods,' 'commercial disparagement,' and 'trade libel.' The tort is 'now generally referred to as 'injurious falsehood.'

63 F.3d 974, 980 (10th Cir. 1995) (internal quotations omitted). Similarly, Wyoming state courts have recognized the tort of injurious falsehood. *See Sweetwater Station, LLC v. Pedri*, 522 P.3d 617, 625 (Wyo. 2022) ("Wyoming defines slander of title as 'a false and malicious statement made

24

in disparagement of a person's title to real or personal property, or of some right of his causing

him special damage.'"); *Bennett v. Pace*, 731 P.2d 33, 34-35 (Wyo. 1987) (discussing one of two

variants of injurious falsehood, that of slander of title rather than slander of business or trade).

Although published state decisions are limited, the elements of injurious falsehood can be

found in the Restatement of Torts. Essentially, one who publishes a false statement harmful to the

property or business interests of another is subject to liability for pecuniary losses if: (1) he intends

for publication of the statement to result in harm to interests of the other having a pecuniary value,

or either recognizes or should recognize that it is likely to do so, and, (2) he knows that the

statement is false or acts in reckless disregard of its truth or falsity. Restatement (2d) of Torts §

623A (1977); *see also Examination Bd. of Pro. Home Inspectors v. Int'l Ass'n of Certified Home

Inspectors*, 519 F. Supp. 3d 893, 918 (D. Colo. 2021)("commercial disparagement claim under

Colorado law, plaintiffs must prove the following elements: "(1) a false statement, (2) published

to a third party, (3) derogatory to the plaintiff's business in general ... or its quality, and (4) through

which the defendant intended to cause harm to the plaintiff's pecuniary interest, or either

recognized or should have recognized that it was likely to do so; (5) with malice; (6) thus, causing

special damages."), aff'd sub nom. 6 F.4th 1238 (10th Cir. 2022).

The difference between defamation in the form of libel or slander as compared to injurious

falsehood has been described by other courts in the Tenth Circuit. Historically, defamation served

to protect personal reputation. *Williams v. Burns*, 540 F. Supp. 1243, 1247 (D. Colo. 1982).

However, over the years, the concept of defamation has been extended to such actions as

falsehoods injurious to the ownership of land, injuries to personal property, and interference with

an individual's business, in other words defamation of trade or title. *Id.* (describing the history of

new protections); *Shanley v. Hutchings*, Civ. No. 222-cv-00549, 2024 WL 496250, at *11 (D. Utah

Feb. 8, 2024) ("While injurious falsehood parallels defamation, it is distinct in that it "protect[s] separate and unrelated interests"; it is a business tort, not a personal tort."). "The word 'disparagement' has been used to describe these various kinds of interference with commercial or economic relations through injurious falsehoods. *Williams*, 540 F. Supp. At 1247. "The main distinction often made by the courts is in the damages—disparagement requires a pecuniary harm. Because of special circumstances, it requires special damages." 11 American Law of Torts § 33:3; *see Farm Bureau Life Ins. Co. v. Am. Nat. Ins. Co.*, 505 F. Supp. 2d 1178, 1191 (D. Utah 2007) ("In order for a plaintiff to recover under a claim of injurious falsehood, it must prove (a) falsity of the statement made, (b) malice by the party making the statement, and (c) special damages.").

In other jurisdictions that have addressed the question, injurious falsehood is not subject to the same statute of limitations as libel or slander. *See, e.g.*, *Full Draw Prods. v. Easton Sports, Inc.*, 85 F. Supp. 2d 1001, 1008 (D. Colo. 2000) (not withstanding Colorado's one year statute of limitations in C.R.S. § 13-80-103 for libel and slander, "a two-year statute of limitations applies to…trade libel claim[s]."); *Cartwright v. Colorado Bank of Walsh, Inc.*, 658 F. Supp. 240, 247 (D. Colo. 1987) (although defendant alleged claims were time-barred, trade libel governed by the catch-all statute of limitations for the state, which was at the time six years (citing *Idaho Norland Corp. v. Caelter Industries, Inc.*, 509 F. Supp. 1070, 1071–72 (D .Colo. 1981)); *see also Rinsley v. Brandt*, 446 F. Supp. 850, 858 (D. Kan. 1977) (although the elements closely overlap false light privacy subject to state's two-year catch-all limitations period instead of one year, because the state's highest court has recognized each as separate and distinct torts). Along a similar vein, Wyoming's one year statute of limitations is expressly limited to "libel or slander" and makes no reference to other forms of defamation. Wyo. Stat. § 1-3-105(a)(v)(A). Because the catch-all limitation is four years in Wyoming – Wyo. Stat. § 1-3-105(a)(iv)(C) – and injurious falsehood is

an "injury to the rights of the plaintiff, not arising on contract and not herein enumerated," then a four-year statute of limitations applies to Plaintiff's injurious falsehood defamation claims, and they are not time-barred.

### b. *Plaintiff is Not a Public Figure but Has Nevertheless Pled Facts Showing Malice.*

"There are two types of public figures: (1) individuals who have achieved such pervasive fame or notoriety that they are a public figure for all purposes and in all contexts; and, more commonly, (2) individuals who have voluntarily injected themselves or been drawn into a particular public controversy and thereby becoming a public figure for a limited range of issues for which they are prominent." *Martin v. Comm. for Honesty & Just. at Star Valley Ranch*, 101 P.3d 123, 127 (Wyo. 2004); *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974) (discussing limited-purpose and general-purpose public figures). A limited-purpose public figure is a public figure only with respect to a limited range of issues and achieves that status by "voluntarily inject[ing] himself ... into a particular public controversy." *Gertz,* 418 U.S. at 351. A general-purpose public figure is one who "becomes a public figure for all purposes and in all contexts." *Id.* Those who electively run for office, or who by reason of the notoriety of their achievements and the vigor and success with which they seek the public's attention are properly classified as public figures. *Id.* at 342-44; *see also Curtis Pub. Co. v. Butts*, 388 U.S. 130, 144 (1967) (". . .elected officials traditionally have been subject to special rules of libel law."). "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." *Gertz*, 418 U.S. at 345. Importantly, **[t]he defamatory statement itself cannot, of course, create a public controversy**." *Martin*, 101 P.3d at 127 (emphasis added). "Clearly, those charged with defamation cannot, by

their own conduct, create their own defense by making the claimant a public figure." *Anaya v. CBS Broad. Inc.*, 626 F. Supp. 2d 1158, 1207 (D.N.M. 2009).

Although the elements and statute of limitations for injurious falsehood differ from those of libel or slander, the same distinctions between defamation of a private or public person applies. *See Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 852 (10th Cir. 1999) ("we apply those general First Amendment principles to the School District's claim for publication of an injurious falsehood."). Defamation against a private person generally requires that a defendant act in reckless disregard of whether his statement was false or acted negligently in failing to ascertain whether the communication was false. *Thomas v. Sumner*, 341 P.3d 390, 402 (Wyo. 2015). Alternatively, when the plaintiff is a public figure, she must show that the defendant's statements were made with "actual malice." *Martin*, 101 P. 3d at 127.  Courts in turn define actual malice as a statement made "with knowledge that it **was false or with reckless disregard of whether it was false or not**." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (emphasis added); *Martin,* 101 P.3d at 131-32 (same).

It is by no means certain that Ms. Lesley constitutes a public figure. Not all public employees do. *See, e.g., Anaya*, 626 F. Supp. 2d at 1198 (finding government employee did not have substantial responsibility or control over the conduct of governmental affairs or such apparent important that the public had an independent interest in her qualifications so as to render her a public official). Ms. Lesley did not run for office nor by means of her own fame, notoriety, or achievements attract public scrutiny. Likewise, she did not "voluntarily" interject herself into a cause of controversy. Rather, much like many library directors and librarians across the country, she was virtually unknown until Defendants began their campaign against her. It was Defendants' injurious falsehoods that cast Ms. Lesley into the proverbial spotlight, thereby militating against

applying the actual malice standard to her claim. However, even if the Court finds her to be a public official or figure, Plaintiff has more than amply pled facts of "actual malice" in her Amended Complaint.

The Wyoming Supreme Court case *Hill v. Stubson* is instructive here. In that case, the Court held that "while the relevant allegations may be scant, we find them sufficient to state a claim for actual malice" after the plaintiff, a school superintendent, supported malice in her complain on only two allegations: (1) the an independent investigation ordered by the legislature found no wrongdoing committed by her, and (2) that the defendant knew his communications were intentionally false when stating otherwise. 420 P.3d 732, 741 (Wyo. 2018). Importantly, "[a]lthough the defendant's state of mind is a subjective fact, it can be shown by indirect or circumstantial evidence. Sufficient indirect evidence of actual malice can defeat a defendant's unsupported statement that he did act in good faith." *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1070 (5th Cir. 1987). Such circumstantial evidence includes, "when a defendant failed to investigate a story weakened by inherent improbability, internal inconsistency, or apparently reliable contrary information." *Id.*

In her proposed Second Amended Complaint, Plaintiff has, as explained above, clarified that the defamation she seeks to vindicate is in the nature of injurious falsehood, and she synthesized her defamation claims into a single claim. *Second Amended Complaint Redlined*, at 44-45. But in her Amended Complaint, Plaintiff has already pled numerous facts demonstrating that Defendants made statements with knowledge of, **or a reckless disregard for**, the falsity of their comments, including accusing Plaintiff of criminal and sexual misconduct and harming children, while all along bragging that they had only done so as part of a campaign to pressure Ms. Lesley into bending to their will. Defendant Susan Bennet for example admitted that she and her

husband went to have Ms. Lesley arrested and fired only because Ms. Lesley refused to comply with their demands to remove books from the shelves. *Amended Complaint*, at ¶¶ 131-33. Mr. Bennett similarly confessed in an article he authored in *Anybody's Auto* that he was deploying strategies learned by MassResistance in mobilizing opposition against books. *Id.* at ¶ 91. And importantly, Defendants continued to harass and discredit Ms. Lesley after multiple legal opinions determined she was in compliance with the law, and that banning books excoriated by Defendants would violate the First Amendment. *Id.* at ¶¶ 136-141, 160-166. Each time such a decision came out, Defendants ignored the findings and continued their drive. *See id.* at ¶ 142 ("Bennett confessing, for example, that "I am not going to change my mind because of something a lawyer chooses to do or not do.").

These facts and others pled throughout her Amended Complaint more than amply allege actual malice within the meaning of *New York Times v. Sullivan*. Particularly given the pervasive and harmful lies spread about Ms. Lesley, she must be able to proceed to discovery on her injurious falsehood claim.

## IV.    The First Amendment Does Not Protect Defendants' Misconduct.

Defendants also argue that Ms. Lesley's injurious falsehood claims are precluded by the First Amendment rights of speech and assembly unless she "proves with convincing clarity" that Defendants acted with actual malice, which purportedly she cannot do.[1] *Motion to Dismiss*, at 19.

---

[1] This position is particularly ironic given that Defendants' entire campaign against Ms. Lesley was predicated on pressuring government employees and public officials to systematically violate and quash the First Amendment rights of others in their community. To wit, in holding that removing books based on viewpoint content violated the constitutional rights of students, the Supreme Court long ago recognized in *Board of Education, Island Trees Union Free District No. 26 v. Pico* that "[o]ur precedents have focused 'not only on the role of the First Amendment in fostering individual self-expression but also on its role in affording the public access to discussion, debate, and the dissemination of information and ideas....In keeping with this principle, we have held that in a variety of contexts the Constitution protects the right to

In using such language, Defendants slip into the standard for summary judgment, but such is not the standard governing the pleadings stage. *See generally MacGuire v. Harriscope Broadcasting Co.*, 612 P.2d 830, 832-33 (Wyo. 1980) ("…even though there may be issues of fact disclosed by the record, if the version claimed by the plaintiff does not satisfy the standard of convincing clarity that precludes any such issue of fact from being an issue of a material fact, and the court still would grant the motion for summary judgment."); *see also Zerangue*, 814 F.2d at 1071 ("While the public figure plaintiff in a libel case must meet the "clear and convincing" standard of proof in order to defeat summary judgment, all of the other summary judgment rules still apply."). For the reasons described above, Ms. Lesley has sufficient pled facts in her Amended Complaint that, if taken as true, support the inference that Defendants acted with "actual malice."

If nothing else, *New York Times v. Sullivan* undercuts Defendants' argument that Plaintiff's claims are precluded by the First Amendment. By promulgating a heightened standard for public

---

receive information and ideas." 457 U.S. 853, 867 (1982). That the First Amendment protects access to literature is particularly relevant to the current frenzy of discriminatory censorship sweeping the nation. For example, in *Little v. Llano County*, the district court issued enjoined a library district from removing books with LGBTQ+ and racial themes, noting that the "[T]he Fifth Circuit, adopting the Supreme Court's plurality in *Pico*, has recognized a 'First Amendment right to receive information' which prevents libraries from 'remov[ing] books from school library shelves 'simply because they dislike the ideas contained in these books.'" Civ. No. 1:22-CV-424-RP, 2023 WL 2731089, at *7 (W.D. Tex. Mar. 30, 2023). Moreover, *Pico* implicated public school libraries, in this case, Ms. Lesley directed an entire general use public library district. Thus, "the right to access to information first identified in *Pico* . . . has 'even greater force when applied to public libraries,' since public libraries are 'designed for freewheeling inquiry,' and the type of discretion afforded to school boards is not implicated. *Id.* at *8; *see also Fayetteville Pub. Library v. Crawford Cnty., Arkansas*, 5:23-CV-05086, 2023 WL 4845636, at *19-21 (W.D. Ark. July 29, 2023) (enjoining enforcement of new state law that criminalizing furnishing "harmful" materials to minors and requiring libraries to challenge books in their collections deemed inappropriate for minors decrying a local governing body's decision to essentially strip the shelves of books espousing unpopular or minority viewpoints as a clear violation of the First Amendment and noting that "an individual has the "right to read or observe what he pleases," and that right is 'fundamental to our scheme of liberty' and cannot be restricted.") (internal quotations omitted); *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 4:23-CV-00474, 2023 WL 9052113, at *26 (S.D. Iowa Dec. 29, 2023) (enjoining enforcement of law that required local libraries to remove books from schools deemed not age-appropriate and banning programming or instruction relating to gender identity and sexual orientation).

officials, the Supreme Court implicitly recognized that even they should have some recourse against malicious falsehoods, notwithstanding the "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, including vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. at 271. That the First Amendment protects freedom of speech and assembly is beyond dispute. "The question [instead] is whether [such speech] forfeits that protection by the falsity of some of its factual statements and by its alleged defamation of respondent. *Id.*

Notwithstanding the protections of the First Amendment, courts have consistently found that campaigns to coerce others, including public officials, to violate the law are not protected by the First Amendment rights of assembly and speech. *See, e.g.*, *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.*, 968 F.2d 286, 296 (2d Cir. 1992) ("It has long been established that the First Amendment provides no defense to persons who have used otherwise protected speech or expressive conduct to force or aid others to act in violation of a valid conduct-regulating statute."); *Brewer*, 238 F.2d at 102 ("Those acts and that type of speech were calculated and intended, at the times and under the circumstances in which they were made, to incite disobedience of the law and the overthrow of law and order and to coerce, intimidate, and compel the school board to cease and desist from the performance of its sworn and lawful duty, and to engage in unlawful conduct. They present no legitimate issue of free speech or assembly."); *Clemmons*, 201 F. Supp. at 748 ("[T]he right of free speech does not carry with it the right to persuade or attempt to persuade others to violate the law.").

Here, Plaintiff opposed discriminatory practices, and rightfully so, protected the First Amendment rights of the community. Defendants' campaign to coerce her into violating the legal rights of others by harassing and maliciously defaming her is not protected assembly or speech.

"The right to petition for redress of grievance is, of course, protected by the First Amendment to the United States Constitution. But just as the right to freedom of speech and freedom of the press is not absolute and unencumbered by corresponding duties, neither is the right to assemble or the right to petition for the redress of grievance so absolute as to allow their exercise with complete disregard for the constitutionally guaranteed rights of others." *Griffon v. Cong. of Racial Equal.*, 221 F. Supp. 899, 900 (E.D. La. 1963). Likewise, courts have consistently found that the types of harassment and injurious falsehoods Defendants subjected Plaintiff too are actionable, even if the plaintiff is a public official.

In *Harte-Hanks Communications v. Connaughton* the Supreme Court, applying the *New York Times v. Sullivan* standard, affirmed a jury verdict for the plaintiff, a candidate for judicial office, against a defendant newspaper who had supported his opponent. 491 U.S. 657, 693 (1989). About one month after the plaintiff lost the election, the incumbent's chief of staff was arrested for bribery charges. *Id.* at 660. The newspaper ran a story the same day quoting a grand jury witness stating that plaintiff had used "dirty tricks" and offered her and her sister jobs and a trip to Florida for their help in the investigation. *Id.* In affirming the verdict the Court noted that, "[t]here is little doubt that 'public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule'. . . [however] [w]e have not gone so far, however, as to accord the press absolute immunity in its coverage of public figures or elections. If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail." *Id.* at 687-88.

Similarly, in *Ralston v. Garabedian* the district court after a bench trial ruled in favor of a public-school teacher who brought defamation claims against a student for falsely accusing him

of sexual abuse and criminal misconduct and disseminating such a story in order to gain an advantage in settlement negotiations. 623 F. Supp. 3d 544, 612-17 (E.D. Pa. 2022).

In *Lewis*, the district court denied summary judgement on plaintiff's common-law defamation and 42 U.S.C. § 1983 conspiracy claims not withstanding that he was a state court judge after defendants, several public officials, reporters, and a newspaper colluded to defame him by publishing false accusations of criminal misconduct. 782 F. Supp. at 1347. And in *Zerangue*, the Fifth Circuit reversed summary judgement for the defendant newspaper, where the plaintiffs - a former chief deputy sheriff and chief of detectives – established a triable issue of fact that the newspaper published erroneous criminal accusations against them maliciously. 814 F. 2d at 1074 (citing as examples *Curtis,* 388 U.S. 130, *McHale v. Lake Charles American Press,* 390 So.2d 556 (La.App.3d Cir. 1980), *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.,* 708 F.2d 944 (5th Cir. 1983), *Batson v. Time, Inc.,* 298 So. 2d 100 (La. App. 1st Cir. 1974), and *Carson v. Allied News Co.,* 529 F.2d 206 (7th Cir.1976) for the proposition that sufficient evidence of actual malice existed in the publishing of false accusations).

The First Amendment does not give Defendants free range to lie about and accuse Ms. Lesley of gross sexual misconduct, criminal activities, or seek to have her arrested, merely because she refused to remove books or discriminate against individuals that they did not like. Such intentionally injurious conduct play no part in activities protected by the First Amendment.

## V.     Plaintiff has Sufficiently Pled That Defendants Imposed Extreme Emotional Distress.

As Defendants state, to make out a claim for intentional infliction of emotional distress in Wyoming, a plaintiff must allege that a defendant, by way of his extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to the plaintiff whereby resulting in liability for such emotional distress. *Leithead v. Am. Colloid Co.*, 721 P.2d 1059, 1065 (Wyo.

1986). Although not every course of conduct which causes some distress is actionable, "[r]ecovery is permitted when emotional distress, which includes reactions such as shame, humiliation, embarrassment and worry, is extreme." *Wilder v. Cody Country Chamber of Com.*, 868 P.2d 211, 223 (Wyo. 1994). Thus, although the tort does not allow recovery for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," (*Worley v. Wyoming Bottling Co.*, 1 P.3d 615, 628 (Wyo. 2000)), where the "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" recovery is warranted. *Hatch v. State Farm Fire & Cas. Co.*, 930 P.2d 382, 396 (Wyo. 1997).

In Wyoming, a wide variety of conduct has given rise to a viable outrageous conduct tort. In *Wilder*, for example, the Wyoming Supreme Court recognized the defendant chamber of commerce's efforts to publicly scapegoat the plaintiff for its financial troubles before terminating him could support an intentional infliction of emotional distress claim. 868 P.2d at 223-24. Defendant placed the plaintiff on probation, reduced his compensation, required him to meet with community groups and accept responsibility for a problem that was not his making, and interfered with his job search efforts after terminating him. *Id.* (citing *Havens v. Tomball Community Hosp.*, 793 S.W.2d 690 (Tex. App. 1990) for the proposition that "holding employer's course of conduct in seeking to humiliate and degrade employee's good name prior to termination stated a cause of action for intentional infliction of emotional distress."). Likewise, in *Worley*, the Wyoming Supreme Court allowed the plaintiff to proceed on an intentional infliction of emotional claim where his employer repeatedly harassed him, threatened him, made impossible work demands, withheld pay raises, and belittled him and his coworkers for minor infractions. 1 P.3d at 629. In *Kanzler v. Renner*, the Supreme Court recognized that inappropriate sexual conduct may give rise to an intentional infliction of emotional distress claim. 937 P.2d 1337, 1341 (Wyo. 1997). In *Bevin*

*v. Fix*, the Wyoming Supreme Court recognized a cause for intentional infliction of emotional distress for third parties witnessing physical abuse. 42 P.3d 1013, 1022 (Wyo. 2002). And in *Loya v. Wyoming Partners of Jackson Hole, Inc.*, the Wyoming Supreme Court recognized the tort after the employer terminated plaintiff while he was tending to his mother on her death bed. 35 P.3d 1246, 1251-53 (Wyo. 2001). This is but a sampling of some of the conduct Wyoming courts have recognized as a basis for an outrageous conduct claim. As in *Wilder*, Defendants intentionally subjected Ms. Lesley to years of public abuse and humiliation, accusing her of bad acts she did not commit, falsely reported her to police, and agitated for her termination. Such conduct constitutes outrageous conduct on the pleadings.

Defendants' reliance on *Hatch* is unavailing. *Motion to Dismiss*, at 22-23. The *Hatch* Court made no effort to limit or catalogue the types of behavior that might constitute outrageous conduct for purposes of supporting a claim. Rather, the Court only noted that the conduct complained of by plaintiffs – that the defendant insurance company had acted without sensitivity in investigating their claim for coverage under their fire insurance policy. 930 P.2d at 395-97. It further noted that "[w]hile the stress the Hatches experienced is not to be minimized, it is typical of the stress all people are expected to endure under the circumstances." *Id.* at 397. Defendants equate *Hatch*'s reference to a "sarcastic," "aggressive," and "hostile" interview with their own conduct, but a simple reading of the case and comparison to the facts alleged by Plaintiff in her Amended Complaint evidences no such similarities. Ms. Lesley, as any reasonable person would, experienced extreme emotional distress after two years of Defendants' public coercion campaign. Out of an abundance of caution, she has included additional factual allegations referencing those feelings of distress in her proposed Second Amended Complaint (¶¶ 147, 207), but her Amended Complaint standing alone sufficiently pleads the basis for her claim to survive dismissal at this stage.

**VI.    Defendants Engaged in Abuse of Process by Reporting Ms. Lesley to the Police.**

Defendants seek dismissal of Plaintiff's abuse of process claim on technical grounds. First, they argue her claim is time-barred. Second, they argue she has not pled abuse of process because no legal proceeding took place. *Motion to Dismiss*, at 24. Both these arguments must fail.

### a.   *Plaintiff's Abuse of Process Claim is Not Time-Barred.*

Defendants contend that because abuse of process is "akin" to malicious prosecution it is subject to a one-year statute of limitations. *Motion to Dismiss*, at 31. They cite no authority to that effect or for the notion that claims "akin" to each other are bound by a statutory statute of limitations that does not specifically enumerate that claim. But more importantly, the Tenth Circuit and Wyoming Supreme Court have taken great pains to distinguish between the two. *See, e.g.*, *Wolford v. Lasater*, 78 F.3d 484, 490 (10th Cir. 1996) (explaining why courts distinguish between malicious prosecution and abuse of process); *Toltec Watershed Imp. Dist. v. Johnston*, 717 P.2d 808, 811 (Wyo. 1986) (distinguishing between abuse of process and malicious prosecution claims). One need not look further than the elements of the claims to see the significant difference between the two of them. The elements of an abuse of process claim in Wyoming are: "(1) an ulterior purpose; and (2) a willful act in the use of the process which is not proper in the regular conduct of the legal proceeding." *The Tavern, LLC v. Town of Alpine*, 395 P.3d 167, 179 (Wyo. 2017). Meanwhile, the elements of a malicious prosecution claim are: "(1) [t]he institution or continuation of original judicial proceedings, either criminal or civil; (2) [s]uch proceedings having been by or at the instance of the defendant; (3) [t]he termination of such proceedings in favor of the plaintiff; (4) [m]alice in instituting the proceedings; (5) [w]ant of probable cause; and (6) [t]he suffering of injury or damage as a result of the action complained of." *Consumers Filling Station Co. v. Durante*, 333 P.2d 691, 694 (1958); *see also Seamster v. Rumph*, 698 P.2d 103, 104 (Wyo. 1985)

(same). These claims then are facially distinct. And although Wyoming assigned a one-year statute of limitations to "malicious prosecution and false imprisonment" claims Wyo. Stat. § 1-3-105(a)(v)(C), it has placed no such limitation on abuse of process claims. They therefore are subject to Wyo. Stat. § 1-3-105(a)(iv)(C), which provides for a four-year statute of limitations for injuries "not arising on contract and not herein enumerated."

> ### b.   *Plaintiff has Pled Sufficient Facts to Establish an Abuse of Process Took Place.*

The main thrust of an abuse of process claim is the manipulation of legal process for reasons other than those intended. *Toltec,* 717 P.2d at 811. The misuse of legal process is not merely circumscribed to civil or criminal lawsuits. Instead, "[t]he phrase 'use of process' as employed in that context refers to some willful, definite act not authorized by the process or aimed at an objective not legitimate in the proper employment of such process." *Pitts v. City of Cuba*, 913 F. Supp. 2d 688, 715 (E.D. Mo. 2012). As such, numerous jurisdictions have indicated that false reports of crime to law enforcement for ulterior motives may constitute an abuse of process. *See, e.g., id.* at 716-18 (refusing to grant summary judgement on abuse of process claims against two defendants for bragging about making false reports to get plaintiffs arrested, about having police officers draw up false reports whenever plaintiffs complained about them, and for forging ex-parte orders and planning to falsely charge and arrest plaintiffs); *McGlory v. Bohlender*, No. Civ. A. 93-2206-EEO, 1994 WL 326022, at *2 (D. Kan. June 15, 1994) ("[. . .if an improper arrest constitutes use of process, so too, would a false police report filed for the improper purpose of causing an innocent person to be prosecuted for a crime she did not commit."); *Jones v. Slay,* 61 F. Supp. 3d 806, 836 (E.D. Mo. 2014) (refusing to dismiss claim for, inter alia, abuse of process where defendant wrongly executed a search warrant, arrested plaintiff, and provided false testimony to the prosecutor and at trial); *Chancellor v. City of Detroit*, 454 F. Supp. 2d 645, 664

(E.D. Mich. 2006) (declining to issue summary judgment on abuse of process claim where plaintiff demonstrated that "Defendants committed an improper act in the use of process (knowingly filing a false police report), and that they had ulterior purpose (causing the Plaintiff to be prosecuted and jailed even where there was no legitimate probable cause to charge him with a crime."); *see also Painter v. Wells Fargo Bank, N.A.*, No. 1:07-CV-0395 MCA/ACT, 2008 WL 11411979, at *3 (D.N.M. Feb. 29, 2008) (although inapplicable to the outcome,"[t]he New Mexico Supreme Court apparently does recognize that in some circumstances, a malicious abuse of process claim may lie against a defendant who knowingly communicates materially false information to authorities.").

Defendants wrongly assert that Plaintiff alleges Defendants filed a criminal complaint, but nothing more. *Motion to Dismiss*, at 25. Plaintiff however, not only alleged that Defendants filed a knowingly false report with law enforcement with the ulterior purpose of pressuring her to remove disfavored books, but that the complaint was further acted upon, including its referral to the County Attorney's office for a legal opinion. *Amended Complaint*, ¶¶ 136-140. Just because the legal opinion clearly exonerated Plaintiff, does not mean that legal process did not issue. The act of the false complaint and its subsequent referral to the County Attorney's office for further investigation and consideration for a purpose for which these legal procedures were not intended – to pressure on Ms. Lesley to perform her job duties in the manner Defendants wished – was an abuse of that process. The Sheriff's Office and County Attorney's Office were not intended to be manipulated in such a manner.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court deny Defendants' Motion to Dismiss. Alternatively, Plaintiff should be allowed to amend her Complaint if the Court finds it lacking.

Date: February 16, 2024

/s/ Iris Halpern
Iris Halpern*
Azra Taslimi*
Qusair Mohamedbhai
Rathod | Mohamedbhai LLC
2701 Lawrence Street
Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
ih@rmlawyers.com
at@rmlawyers.com
qm@rmlawyers.com
*Attorneys for Plaintiff*

*\* Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

       I hereby certify that on February 16, 2024, a true and correct copy of the forgoing was filed with the Clerk of the Court using the CM/ECF portal, which will serve all counsel of record.

*/s/ Iris Halpern*
Counsel for Plaintiff

41