FILED

9:02 am, 4/11/25

Margaret Botkins
Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

TERRI LESLEY,

Plaintiff,

VS.

Case No.  2:23-CV-177

HUGH BENNETT, SUSAN BENNET,
and KEVIN BENNET,

Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (ECF NO. 44)

THIS MATTER comes before the Court on Defendants' *Motion to Dismiss* (ECF No. 44), filed on April 4, 2024. Plaintiff responded on April 25th (ECF No. 45), and Defendants replied on May 1st (ECF No. 48). We find that Plaintiff has plead sufficient factual material to support her Section 1985(3) claim, her civil conspiracy claim, and her intentional infliction of emotional distress claim, and we dismiss her Section 1985(1) claim and her claims of abuse of process and injurious falsehoods.

### BACKGROUND

This case was brought to us by a former county librarian who alleges, among other things, that Defendants conspired with county officials to deprive her and the LGBTQ community of their constitutional rights and prevent her from performing her own constitutional duties. Defendants identified Ms. Lesley to be an advocate for the

1

LGBTQ+ community after she posted on the library's social media page during Pride

Month about books featuring LGBTQ+ characters and narratives. For the next two years,

Defendants allegedly criticized and harassed Ms. Lesley in attempts to coerce her to

remove books featuring gay, lesbian, and transgender themes, as well as some books with

Black characters, from the library. After refusing to remove the books one final time, Ms.

Lesley was fired by the County commissioners. She brings this claim now alleging

violations of Section 1985(1) and (3), civil conspiracy, injurious falsehood, intentional

infliction of emotional distress, and abuse of process.

Ms. Lesley was a librarian at Campbell County Public Library System ("CCPLS")

in Gillette, Wyoming, from 1996 until 2023, and was Executive Director of the library

from 2013 until she was fired. ECF No. 43 at 5-6. CCPLS is a Department of Campbell

County, which is overseen and governed by the Campbell County Board of

Commissioners. *Id.* at 5. The Board has five elected Commissioners, who in turn appoint

members of the CCPL Board of Trustees ("Library Board"). *Id.* The Library Board also

has five members, and they are responsible for setting CCPLS' policies and appointing

the CCPLS Executive Director – the position held by Ms. Lesley for eleven years. *Id.* 6-

7.

In June of 2021, presumably under the direction of Ms. Lesley, the library

published a post on its Facebook page with a link to the library's "Teen Blog," stating

"June is pride and Rainbow Book Month. For this month's Teen Room blog, a staff

member (Sarah) writes about a few titles you can check out from your library that will

connect you with the LGBTQIA+ collection at CCPL." *Id.* at 8.

2

Plaintiff alleges that in response to this post, County Commissioners and Defendants began a campaign to publicly discredit Ms. Lesley and coerce her to remove books with LGBTQ content removed from the library. This began with two Commissioners, Del Shelstad and Colleen Faber, emailing criticism of the post to Ms. Lesley. *Id.* Commissioner Shelstad also commented on the Facebook post, stating that the County had not designated Pride Month or Rainbow Book Month. *Id.* at 8. A few weeks later, Defendants coordinated with the Commissioners to require Ms. Lesley to attend the July County Commission meeting. *Id.* at 10. At the meeting, both the Commissioners and Defendants voiced criticism. Commissioner Reardon asked her if there was a "straight" section at the library and stated, "I'm just asking you not to have a gay pride month." *Id.* Defendants described Pride Month as "immoral," "perverted," "wicked," and part of "the ground game of an attempt to destroy our culture and our country… what you're looking at right here is a promotion of immorality and perversion." *Id.* at 11. They also described Pride Month as "pedophilic," and claimed that LGBTQ+ "sexual identities… are known to cause suicide and HIV." *Id.* at 12. Ms. Bennett also suggested that the Black Lives Matter movement was also connected to suicide. *Id.* at 12-13. The Bennetts concluded by asking the Commissioners to remove books referencing LGBTQ+ people from the children and teen collections of the library, naming several titles. *Id.* at 13. Commissioner Reardon suggested that the teen section be closed because of "dark" and "bad" books. *Id.* at 14.

Plaintiff alleges that Defendants and Commissioners similarly coordinated to prevent a magic show at the library that was also scheduled in July. Commissioner

Sheldon emailed Ms. Lesley that the magician scheduled to perform was transgender, and that "transgender acts" should not be funded by the County. *Id.* Plaintiff alleges that Defendants encouraged other residents to make public statements against the show because of the sexual orientation of the performer. *Id.* at 15. Library staff and the magician received vague but menacing threats in the days leading up to the show: an individual came to the library and warned the front desk staff that they should "cancel the program or else," and the magician received violent threats online and by phone. *Id.* at 16. Just before the event, the magician decided not to perform, citing safety concerns for the children and herself. *Id.* At the following Board meeting, Ms. Lesley alleges the Bennetts identified themselves as "speaking for the group of censorship advocates," blamed Ms. Lesley for "bringing transsexualism into this community," and criticized everyone for not informing the public that "we had a transgender performer scheduled for our kids." *Id.* at 17.

Ms. Lesley specifically alleges collusion between the Defendants and the Commissioners based on the transcript of a group chat between Commissioners Shelstad and Faber and several residents, which discussed a plan to ban LGBTQ+ library books. One resident wrote: "We need to run a hard email campaign where we all send individual messages to the commissioners and possibly the library board. I think it would be the [sic] wise to get ourselves all on the same page... [T]he whole board needs to be fired." *Id.* at 18. Regarding the performer, the individual stated: "[w]e have the video evidence this guy is a tranny. That should not be put in front of kids because it's... ideological

4

subversion. It's grooming." *Id*. It is unclear if the Bennetts were specifically part of this group chat, or if Plaintiff possesses that information at this time.

The Bennetts formally organized their initiatives with the assistance of MassResistance, a group with a "confrontational style of advocacy" which has been labeled a hate group by the Southern Poverty Law Center and which publicly claims that homosexuality is linked to pedophilia and that trans women are sexual predators. *Id.* at 19. The Bennetts raised funds from members of the organization (where they are also members) to display billboards around Gillette, bearing statements such as "Stop child indoctrination at our library" and "Warning: Inappropriate Youth Books in Library" along with organization's name and a phone number. *Id*. at 20. Defendants also possess a small-scale magazine related to their business, through which they published ten articles accusing Ms. Lesley of exposing children to pornography and claiming that they would mobilize their followers to "storm" the July 7th County Commission meeting because of pornography in the libraries. *Id.* at 21.

The Bennetts also requested the removal of certain books with prominent Black characters. At a Joint Library Board and County Commissioner meeting in August, Ms. Lesley explained, after being criticized again for promoting "pornography" and refusing to ban books, that the library had a system for the public to submit requests for the "reconsideration of library materials." *Id*. No such requests had been received. *Id.* In the four months after the August meeting, the library received fifty-seven requests for reconsideration on twenty-nine library books. *Id*. at 24. Commissioners Faber, Maul, and Shelstad each submitted requests, and the Bennetts submitted seven between them, for

books like "The Babysitter's Coven" by Kate Williams and "This Book is Gay" by Juno

Dawson. While most of the criticism centered around LGBTQ+ content, Kevin Bennett

criticized "The Babysitter's Coven" for having a Black character that is portrayed as

cooler than the white characters:

> People of color represent several of the characters in the book and they're
> represented as cool whereas the protagonist and first person is just sort of a
> boring gothy white chick. It sort of romanticizes a different cultural set which
> I think is very damaging… In this library, we see the gay agenda, critical race
> theory (CRT)… both are in this book. [The story] causes white readers to
> experience unnecessary cognitive dissonance whose uber purpose from a
> social Marxism framework is to demoralize, confuse, and initiate self-hatred
> based on ethnicity. It's subtle, but it's there, and that shouldn't be introduced
> to teenagers who already have enough problems.

*Id.* at 24-25. Per policy, Ms. Lesley began to the review the books while continuing to

receive criticism at board meetings throughout 2021, including public allegations that she

was violating the law and calls for her to be fired.

Ms. Lesley alleges that these were deliberate tactics in coordination with some of

the Commissioners to intimidate her "into complying with their censorship demands." *Id.*

at 25. In what she alleges was an act of further intimidation, Hugh and Susan Bennett

went to the Campbell County Sherriff's Office in September and formally accused Ms.

Lesley of disseminating obscene material to children in violation of Wyoming criminal

law. *Id.* at 27. At a board meeting in October, Susan Bennett stated that although she

"love[s] LGBTQ people," "there would be no charges brough against anybody" if Ms.

Lesley had removed the books in July. *Id.* Kevin Bennett carried a sign that read "FIRE

THE DIRECTOR." *Id.* at 28. A month later, the County Attorney explained that the

library books are not considered obscene and that there were no legal grounds to support

criminal prosecution. *Id.* at 30. However, the Bennetts continued to accuse Ms. Lesley of violating the law and called for her resignation, encouraging other residents to do the same. Plaintiff alleges that this attempt to bring criminal charges was aimed at blackmailing and extorting her to remove certain books.

In February of 2022, a library board member resigned. In April the County Commissioners appointed Sage Bear, with the encouragement of the Bennetts, who believed that she did not support the "LGBTQAI agenda." *Id.* at 33. In a meeting with Ms. Lesley, Ms. Bear proposed removing books from the children's section and placing warning signs in the library. *Id.* Ms. Lesley informed Ms. Bear that such actions risked violating the First Amendment, based on analysis from a Campbell County Attorney stating that "Due to protections for freedom of speech and religion under the First Amendment, the current library policy rejects appeals based on content deemed offensive by a group or individual… relocation of two books is arguably censorship and therefore a violation of policy and the law." *Id.* at 34. Ms. Bear sought a second opinion from a private law firm, which confirmed the County attorney's conclusion. *Id.* at 34-35. Plaintiff alleges that Ms. Bear coordinated and collaborated with the Bennetts on these actions.

In May, after advocacy from the Bennetts, the Commissioners decided to cut one percent of the library's budget (about $32,000), which had been designated for youth programming, as punishment for its refusal to move the challenged books.

In August of 2022 four of the five Library Board positions became vacant and were replaced by the Commissioners with individuals that shared the same ideology as

themselves and the Bennetts. Plaintiff alleges that all three groups frequently met together and "plotted… to challenge and censor disfavored books and to pressure Ms. Lesley." *Id*. at 37. In September, Board Member Bear stated to another County employee that she intended to revise the policy for selecting library books and fire. Ms. Lesley. *Id*. The revisions were approved in June of 2023, and two weeks later Board Member Bear asked Ms. Lesley for an update on removing books. *Id*. at 38. Ms. Lesley stated that no books had been challenged since the new policy was put into place. *Id*. At a July Library Board meeting, Board Member Bear again asked Ms. Lesley to remove the books. Ms. Lesley responded that removing them would be a violation of the First Amendment. *Id.* at 38. At a meeting the following day, Board Members asked Ms. Lesley to resign, citing her refusal to remove various unspecified books. Ms. Lesley refused, asked for a public hearing, and was fired on July 28th. *Id.* at 38-39.

## STANDARD OF REVIEW

In considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss, district courts follow a two-pronged approach. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id. Iqbal* clarified that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The Court stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere possibility that Defendants acted unlawfully, but the complaint does not need to establish that Defendants probably acted unlawfully. *See id.*

## ANALYSIS

### I.    The Ku Klux Klan Act, 42 U.S.C. § 1985(1) claim

Section 1985(1) states that "If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof…," that officer (or person prevented from obtaining office) may recover damages against the "conspirators."

Both the Supreme Court and the Tenth Circuit have held that this cause of action only exists for federal officers. The Supreme Court held that it "proscribe[s] conspiracies that interfere with… the performance of official duties by federal officers" and only applies to "institutions and processes of the federal government – federal officers." *Kush*

*v. Rutledge*, 460 U.S. 719, 724 (1983). The Tenth Circuit has dutifully concurred: "As the clear language of the statute provides, § 1985(1) only applies when *federal* officers are prevented from discharging their duty." *Gallegos v. Jicarilla Apache Nation*, 97 F. App'x 806, 811 (10th Cir. 2003) (emphasis in original); *see also Payn v. Kelley*, 702 F. App'x 730, 733 (10th Cir. 2017) (affirming the district court's ruling that "§ 1985(1) by its terms only applies to conspiracies to interfere with the performance of duties by federal officers"). Courts in other circuits have held that a plaintiff who had some federal duties, even if they are not fully a federal officer, might also have a colorable claim. *See Lewis v. News-Press Gazette Co.,* 782 F. Supp 1338, 1341-42 (W.D. Mo. 1992) (holding that a state judge had both state and federal roles and could therefore allege damages under §1985(1)).

Even considering the more expansive interpretation of courts in other jurisdictions, we cannot find that Ms. Lesley has stated a claim on which relief could be granted. Nowhere in Ms. Lesley's complaint does she state that she held, or attempted to hold, federal office, or that any of her duties were federal duties. We therefore dismiss her claim under §1985(1).

**II.      The Ku Klux Klan Act, 42 U.S.C. § 1985(3) claim**

   a.   Clause One – Deprivation of Equal Protection of Laws

Plaintiff articulates claims under two different clauses of § 1985(3). The first clause states that a person has a claim for damages "If two or more persons in any State or Territory conspire… for the purpose of depriving, either directly or indirectly, any

10

person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."

Breaking this down somewhat, to state a claim under the first clause of § 1985(3), plaintiffs must show (1) a conspiracy; (2) to interfere with their rights; (3) because of racial or class-based animus; (4) an act in furtherance of the conspiracy; and (5) a resulting injury or deprivation. *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 101–03 (1971)).

Viewed in the light most favorable to the Plaintiff, we find that there is sufficient factual matter to support several of these requirements and not much further discussion is required. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Ms. Lesley claims that the Bennetts conspired, with each other and other members of the community, to deprive her of the equal protection of the law because of her advocacy and association with the LGBTQ+ community. ECF No. 43 at 40. Essentially, she states that she was discriminated against because of her advocacy, which resulted in her being harassed, threatened, and fired. A district court in the Fifth Circuit held that similar conspiracy claims from a librarian who was fired for refusing to remove LGBTQ+ from the library was sufficient to survive a motion to dismiss. *Baker v. Llano Cnty.*, No. 1:24-CV-228-RP, 2024 WL 4002470, at *10 (W.D. Tex. Aug. 27,

2024). It is also self-evident that Plaintiff's association with the LGBTQ+ community were the primary motivation for Defendants' and their co-conspirators' actions.[1]

Defendants rest their argument on requirements two and three; they claim that Ms. Lesley's claim fails because LGBTQ+ people cannot be considered a "class" under Section 1985(3) and that the "rights" that she claims were violated are not the type protected by this type of law. Regarding these requirements specifically, the Supreme Court has said that "In order to prove a private conspiracy in violation of the *first* clause of § 1985(3), a plaintiff must show, *inter alia,* (1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lies] behind the conspirators' action, and (2) that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment." *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268 (1993) (citations omitted). We will discuss each in turn.

      i.  Racial, or perhaps otherwise class-based, invidiously discriminatory animus

Defendants argue that Ms. Lesley cannot allege a Section 1985(3) claim both because LGBTQ+ people do not constitute a class and because she herself is not part of that class. To the first point, while Plaintiff's claim for relief only mentions animus towards the LGBTQ+ community, it is clear from her statement of facts that at least one of the Bennetts was motivated by racial animus as well – the complaint excerpts a

---

[1] As the Supreme Court has said, the fact that Ms. Bennett once said "I love LGBTQ people" has no bearing on this matter if her actions were discriminatory: "We do not think that the "animus" requirement can be met only by maliciously motivated, as opposed to assertedly benign (though objectively invidious), discrimination." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993).

complaint to the library submitted by Kevin Bennett stating that he believes books with

Black characters that are "cooler" than white characters should not be in the library. ECF

No. 43 at 25-26. Conspiracies motivated by racial animus are well within the purview of

Section 1985(3), as we will discuss below. However, we find that Ms. Lesley's claim is

also successful based on her advocacy for LGBTQ+ people alone.

The "racial, or perhaps otherwise class-based" animus requirement for Section

1985(3) claims derives from a 1971 Supreme Court case that both expanded and limited

causes of action under the law: *Griffin v. Breckenridge*. Section 1985(3) was passed as

part of the Ku Klux Klan Act in 1871, but "languished in relative obscurity" until the

*Griffin* opened the door to allow suits against private plaintiffs, not just state actors. Jason

Hanselman, *The Long Arm of Bostock v. Clayton County: Opening 42 U.S.C. S 1985(3)*

*to Claims of Anti-LGBT Discrimination*, 90 U. Chi. L. Rev. 1159, 1164 (2023). In doing

so, the Court was wary of creating a "general federal tort law," and therefore constrained

possible claims to those with "some racial, or perhaps otherwise class-based, invidiously

discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. 88, 102 (1971).

The opinion quotes a congressman's statement from 1871, stating that the purpose of the

law was to prevent

> deprivations which shall attack the equality of rights of American citizens;
> that any violation of the right, the animus and effect of which is to strike
> down the citizen, to the end that he may not enjoy equality of rights as
> contrasted with his and other citizens' rights, shall be within the scope of the
> remedies…

*Id*. at 100 (quoting Cong. Globe, 42d Cong., 1st Sess., App. 479 (1871)).

The Court has taken up only a handful of Section 1985 cases in the subsequent fifty years and has never concretely defined what it considers a class. In 1983, the Court acknowledged that the question of what classes the law might cover was "difficult," and that "there is some legislative history to support the view that § 1985(3) has a broader reach [than just race-based animus]," but concluded that the law did not reach "conspiracies motivated by economic or commercial animus." *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 836, 838 (1983).

In 1993, the Court in *Bray*, while again failing to provide a concrete definition, reiterated *Griffin*'s emphasis on discriminatory animus and equal protection and seemingly approved of a sex-based class in dicta. It held that abortion-seekers were not a valid class because animus directed towards them was not inherently "invidiously discriminatory" in the same way that it would have been for a class of "women in general," in part because sex discrimination receives heightened scrutiny and abortion regulation does not. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269, 271-272 (1993). While finding it "unnecessary to decide" whether sex is a qualifying class, the Court also stated that "respondents' contention that a class-based animus has been established can be true only if one of two suggested propositions is true: (1) that opposition to abortion can reasonably be presumed to reflect a sex-based intent..." *Id*. at 270. Simplifying this statement somewhat, the Court states, at least in dicta, that class-based animus *would be established* if the conspirators' behavior reflected sex-based intent.

The Court further emphasized the linkages between the "class-based animus" and the type of discrimination that would violate equal protection, using the same broad quote from the 1871 Congress referenced by *Griffin*. *Id*. at 268-69. The Court also cited its own precedent on discrimination under the Equal Protection Clause: "Discriminatory purpose, we said… implies that the decisionmaker… selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group. The same principle applies to the 'class-based, invidiously discriminatory animus requirement of § 1985(3)." *Id*. at 271-272 (citations omitted).

The Tenth Circuit has adjusted its position over the years in response to these cases. In In 1982 the court interpreted *Griffin* to recognize the existence of religious-based classes. *Taylor v. Gilmartin*, 686 F.2d 1346, 1357 (10th Cir. 1982) (holding that the plaintiff "demonstrates that the defendants singled out plaintiff because of his status as a member of the Old Catholic Church" and concluding as a consequence "that there is adequate evidence of the type of class-based, invidiously discriminatory animus envisioned in Griffin" to withstand a motion for summary judgment). Reading *Scott* more narrowly, in the 1980s the court declared that handicapped persons could not constitute a class, and stated in dicta that it "could find nothing [in the *Scott* opinion] to give any encouragement whatever to extend § 1985 to classes other than those involved in the strife in the South in 1871 with which Congress was then concerned." *Wilhelm v. Cont'l Title Co.*, 720 F.2d 1173, 1176 (10th Cir. 1983).

*Wilhelm* is the case most heavily relied on by Defendants. Even after *Wilhelm*, however, other district courts in the Tenth Circuit held that Section 1985 reached sex-

based animus: "We are… not persuaded by defendants' argument that § 1985(3) does not

apply to sex discrimination…Neither *Scott* nor *Wilhem* had anything to do with sex as a

class." *Scott v. City of Overland Park*, 595 F. Supp. 520, 527-28 (D. Kan. 1984). It

further held that "certain class traits, such as race, religion, sex, and national origin, per se

meet this requirement." *Id.* at 528 (quoting *Scott*, 463 U.S. at 853 (Blackmun, J.,

dissenting, joined by Brennan, Marshall, O'Connor, JJ.). Other district courts in the Tenth

Circuit agree. *Roybal v. City of Albuquerque*, 653 F. Supp. 102, 106 (D.N.M. 1986)

("Discriminatory conspiracies motivated by a sex-based animus are within the scope of

section 1985(3)").

More importantly, *Wilhelm* does not reflect the Circuit's most recent position on

the matter, and therefore it does not dispose of this case. After *Bray*, the Circuit largely

abandoned its historical analysis, and instead reverted to its earlier, pre-*Wilhelm*

definition: Section 1985(3) claims must be alleged based on "statutorily protected

class[es]." *Yaklich v. Grand Cnty.*, 278 F. App'x 797, 801 (10th Cir. 2008) (quoting

*Silkwood v. Kerr–McGee Corp.*, 637 F.2d 743, 746 (10th Cir.1980)); *see also Nielson v.*

*Soltis,* 41 F.3d 1516 (10th Cir. 1994) (dismissing a class because the group was "not a

protected class for purposes of the Civil Rights laws"); *Robinette v. Schirard*, No. 10-CV-

02172-CMA-KLM, 2011 WL 5864072, at *5 (D. Colo. Nov. 22, 2011), order vacated in

part on reconsideration on other grounds, No. 10-CV-02172-CMA-KLM, 2012 WL

3038722 (D. Colo. July 24, 2012) ("§ 1985(3) covers conspiracies based on gender, national origin, political association, and religious affiliation").[2]

This is roughly the same conclusion that several other circuits have come to. *See, e.g., Post v. Trinity Health-Michigan*, 44 F.4th 572, 580 (6th Cir. 2022) ("We have held that § 1985(3) reaches… conspiracies targeting a person based on a classification (like racial discrimination) that would receive heightened scrutiny under the Supreme Court's equal-protection framework"); *Farber v. City of Paterson*, 440 F.3d 131, 137 (3d Cir. 2006) (confirming that "§ 1985(3) extended to women, who constitute an objectively identifiable class, alongside other groups with "immutable characteristics"); *Aulson v. Blanchard*, 83 F.3d 1, 5 (1st Cir. 1996) ("'class-based animus' naturally presumes that there is a specific, identifiable class against whom the defendants can have discriminated"); *McLean v. Int'l Harvester Co.*, 817 F.2d 1214, 1219 (5th Cir. 1987) (recognizing classes "characterized by "some inherited or immutable characteristic"); *Anderson v. Cardona*, No. 22-55328, 2024 WL 3326066, at *1 (9th Cir. July 8, 2024) (citing *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992), which "require[s] either that the courts have designated the class in question a suspect or quasi-

---

[2] The Tenth Circuit probably *does* appear to require a showing of race when the class suggested is a *political* one. In *O'Connor v. St. John's College,* this Circuit dismissed a Section 1985(3) claim in which a man alleged he was arrested for his protests of the Bush administration. 290 F. App'x 137, 138 (10th Cir. 2008). The claim was dismissed for other reasons, but in a footnote the court noted: "While the Supreme Court has not yet decided whether the statute covers wholly non-racial, *politically motivated* conspiracies, *see Scott*, 463 U.S. at 836–37, and while other Courts of Appeal are split on the issue, see *Farber v. City of Paterson*, 440 F.3d 131, 135, 138–39 (3d Cir.2006) (collecting cases), our court has signaled that § 1985(3) requires at least a "commingling of racial and political motives." *Brown v. Reardon*, 770 F.2d 896, 907 (10th Cir.1985)." *Id.* at 141 n.4 (citations cleaned up, emphasis added). *Brown* also concerned a politically motivated conspiracy. The Court has recognized that politically motivated conspiracies are a particularly thorny issue because of how vastly it would expand the use of the law. *See Scott*, 463 U.S. at 836–37.

suspect classification requiring more exacting scrutiny or that Congress has indicated

through legislation that the class required special protection"); *Trautz v. Weisman*, 819 F.

Supp. 282, 294 (S.D.N.Y. 1993) ("gender-based discrimination has been held to be

invidious class-based animus under § 1985(3)" because courts have treated sex

discrimination with heightened scrutiny); *Haverstick Enters., Inc. v. Fin. Fed. Credit,*

*Inc.*, 32 F.3d 989, 994 (6th Cir.1994) ("A class protected by section 1985(3) must possess

the characteristics of a discrete and insular minority, such as race, national origin, or

gender.").

　　Based on this rather elaborate research project, while the Tenth Circuit has yet to

make a specific finding on whether sex is a class, we find their general guidelines, as well

as the reasoning of our fellow district courts and the other circuit courts, plus the

insinuations of the Supreme Court in *Bray*, are sufficiently persuasive: discriminatory

conspiracies motivated by a sex-based animus are within the scope of Section 1985(3).

　　The rest of the analysis on this issue – whether sex discrimination includes

discrimination based on sexual orientation – is relatively simple, thanks to a recent Tenth

Circuit decision. In July, this Circuit held that the Equal Protection Amendment

incorporates the Supreme Court's holding in *Bostock* that sex discrimination

encompasses discrimination against sexual orientation or gender identity. *Fowler v. Stitt*,

104 F.4th 770, 794 (10th Cir. 2024) (citing *Bostock v. Clayton Cnty., Georgia*, 590 U.S.

644, 660 (2020), for the proposition that "it is impossible to discriminate against a person

for being homosexual or transgender without discriminating against that individual based

on sex"). In doing so, the Tenth Circuit concluded that discrimination against such

18

individuals should receive intermediate scrutiny. *Id*. This builds on top of the Supreme

Court's acknowledgement of the LGBTQ community as a class:

> Although the Supreme Court avoided deciding whether gays and lesbians
> comprise a quasi-suspect class, triggering heightened or intermediate
> scrutiny of laws that single them out, at a minimum the Supreme Court
> acknowledged that same-sex couples constitute a class for purposes of an
> equal protection analysis. *See* [*U.S. v.*] *Windsor*, 133 S.Ct. [2675] at 2692;
> *Romer* [*v. Evans*], 517 U.S. [620] at 631–32, 116 S.Ct. 1620; *see also*
> *Obergefell v. Kasich*, No. 1:13–cv–501, 2013 WL 3814262 at *6.

*Jenkins v. Miller*, 983 F. Supp. 2d 423, 460 (D. Vt. 2013) We therefore also conclude

discrimination against based on gender identity and sexual orientation, falling under the

umbrella of sex discrimination, is covered under Section 1985(3).

The final issue on this topic is whether Plaintiff, as an advocate, can assert a claim

under the first clause of § 1985. As a first step, both the Supreme Court and the Tenth

Circuit recognize that advocates for Black people may assert a claim. During the

Supreme Court's discussion of class in *Scott*, it stated that "The predominate purpose of §

1985(3) was to combat the prevalent animus against Negroes *and their supporters*." 463

U.S. at 836 (emphasis added) *see also Waller v. Butkovich*, 584 F. Supp. 909, 937

(M.D.N.C. 1984) (interpreting the same language to conclude that "animus against

advocates of equal rights for black people is within the scope of activity against which §

1985(3) is directed"). The Tenth Circuit has also held that plaintiffs who are supporters or

advocates for the poor and for minorities may allege legitimate § 1985(3) claims,

regardless of their race. *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1266, 1267,

1273-73 (10th Cir. 1989) (holding that the plaintiff alleged sufficient "discriminatory

animus against blacks and those who help blacks" to sustain a §1985(3) complaint,

building off of its § 1981[3] analysis earlier in the opinion: "as this court and other circuits

have held, alleged discrimination against a white person because of his association with

blacks may state a cause of action"); *accord Johnson v. Univ. of Cincinnati,* 215 F.3d

561, 575 (6th Cir. 2000) ("the race of the minorities for which he was advocating would

be 'imputed' if you will to the Caucasian… official"[4]).[5]

We next consider whether relief under Section 1985(3) is limited exclusively to

supporters of race-based groups. We find that it is not. The Third Circuit, one of the only

circuits to have analyzed the issue, has confirmed that this language extends to supporters

and advocates of protected groups, including non-race-based classes. *Farber v. City of

Paterson*, 440 F.3d 131, 141 (3d Cir. 2006) (holding that "a § 1985(3) plaintiff need not

be a member of the class against which a conspiracy directs its invidiously discriminatory

animus" – for instance a "*male* victim of sexually discriminatory animus directed at

*women*" has a valid claim). We agree; neither Defendants nor this Court has found any

textual support nor caselaw that would require an arbitrary line to be drawn between

advocates of racial groups and advocates of other protected classes.

---

[3] Analysis of Section 1981 is particularly relevant in this case because it is a law that was borne out of the same
piece of legislature as § 1985, similarly contains no advocate-specific language.
[4] Defendants contend that the fact that the plaintiff in *Johnson* is Black renders this case irrelevant. However, they
seem to misunderstand the holding. The case also cites several previous cases in which white plaintiffs could allege
§ 1981 claims for advocating or associating with Black people. 215 F.3d at 574-75 (citing *Winston v. Lear–Siegler,
Inc.*, 558 F.2d 1266, 1270 (6th Cir.1977) and *Alizadeh v. Safeway Stores, Inc.*, 802 F.2d 111, 114 (5th Cir.1986)).
[5] It is worth noting that the Ninth Circuit disagrees with the Tenth. *See Gaetz v. City of Riverside*, 722 F. Supp. 3d
1054, 1071 (C.D. Cal. 2024) ("The law of this circuit is clear: the plaintiff must be a member of the class
discriminated against to claim the benefits of § 1985(3)'s equal protection clause" (citing *Canlis v. San Joaquin
Sheriff's Posse Comitatus*, 641 F.2d 711, 721 (9th Cir. 1981)). However, the Ninth Circuit's conclusions have only
persuasive, not binding, authority here.

Because Defendant has presented no clear reason why "supporters" should be limited to only race-based classes, we find no reason to dismiss Plaintiff's claim on the grounds that her advocacy would not result in the classes' protected characteristics being imputed to her.

ii.  Rights Protected Against Official Encroachment

To state a claim against § 1985(3)'s first clause for a private conspiracy, plaintiffs must allege that defendants are "interfering with rights that are protected against private, as well as official, encroachment." *Bray*, 506 U.S. at 268.

While it is not immediately clear from her second amended complaint, Plaintiff's response brief clarifies that she grounds her § 1985(3) first-clause claim in the Fourteenth Amendment. ECF No. 45 at 17. She makes the argument that all of the Supreme Court cases have reiterated that Section 1985(3) allows causes of action against private conspiracies, and thereby seems to imply that Section 1985 could expand the Fourteenth Amendment, allowing enforcement against private individuals. *Id*. at 17-18.

Unfortunately for Ms. Lesley, both the Supreme Court and the Tenth Circuit have foreclosed that path. The Supreme Court has said that section 1985(3) "provides no substantive rights itself" to the class conspired against. *Great American Federal Savings & Loan Assn. v. Novotny*, 442 U.S. 366, 372 (1979). In other words, § 1985 provides the cause of action, but the source of the right originates elsewhere. This indicates that Section 1985 cannot be used to expand or alter a right like those found in the Fourteenth Amendment. The Court reiterates this in *Bray*:

> The statute does not apply, we said, to private conspiracies that are "aimed at a right that is by definition a right only against state interference," but applies only to such conspiracies as are "aimed at interfering with rights ... protected against private, as well as official, encroachment."… Moreover, the right to… Fourteenth Amendment liberty… and other elements of those more general rights are obviously *not* protected against private infringement."

*Bray*, 506 U.S. at 278 (citing *Scott*, 463 U.S. at 833). The Tenth Circuit agrees:

"Fourteenth Amendment claims… fail as [the Amendment] do[es] not erect a shield

against merely private conduct however discriminating or wrongful." *Tilton v.*

*Richardson*, 6 F.3d 683, 687 (10th Cir. 1993); *accord Volunteer Med. Clinic, Inc. v.*

*Operation Rescue*, 948 F.2d 218, 226 (6th Cir. 1991).

Ms. Lesley is likely correct in pointing out that the 1871 Congress intended the

Fourteenth Amendment to reach private conduct. *See Scott*, 463 U.S. at 841, n.3

(Blackmun, J., dissenting) ("The Forty-Second Congress[] view[ed]… its constitutional

authority in 1871 to reach private conduct under the Fourteenth Amendment"). However,

over time the Court has narrowed the Amendment's ambit to the version we are left with

today, which does not reach private action.

   iii. State action or involvement

And yet, the fight is not over. As this Circuit has said, "state action or involvement

in the alleged conspiracy [is] a required element of a § 1985(3) claim alleging deprivation

of First Amendment rights." *Jackson v. Coons*, 719 F. App'x 732, 733 (10th Cir. 2017)

(citing *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463

U.S. 825, 830, 832 (1983); *Tilton v. Richardson*, 6 F.3d 683, 686-87 (10th Cir. 1993)).

Logically, the same would hold true for alleged deprivations of Fourteenth Amendment rights, as it also protects only against state encroachment.

While the words "under the color of state law" do not appear in Plaintiff's complaint, she clearly alleges that the conspiracy against her involved state authorities. Although Ms. Lesley only seeks damages from the Bennetts, she names additional state actors as co-conspirators in her complaint: "Defendants plotted, coordinated, and executed a common plan with each other and with certain *Campbell County Commissioners and Campbell County Library Board Members* to engage in obstruction, intimidation, and threats…" ECF No 43 at 40 (emphasis added).

Section 1985(3) applies to conspiracies under color of state law, as well as private conspiracies. *See, e.g., Bray*, 506 U.S. at 268, ("In *Griffin* this Court held, reversing a 20–year–old precedent, *see Collins v. Hardyman*, 341 U.S. 651 (1951), that § 1985(3) reaches not only conspiracies under color of state law, but also purely private conspiracies"). The major Court cases we have so far discussed, *Bray, Scott,* and *Griffin* all dealt with the particularities of private conspiracies. When state actors are involved, the analysis is decidedly simpler: the Fourteenth Amendment clearly contemplates, and has been interpreted, to allow enforcement against state actors, and therefore conspiracies involving state actors are liable under a § 1985(3) claim alleging a Fourteenth Amendment violation. *See Phelps,* 886 F.2d at 1272-73 (holding that the Equal Protection Clause of the Fourteenth Amendment was enforceable against state actors through § 1985(3)); *accord Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1340 (11th Cir.) (same).

It is not entirely clear whether a Section 1985 Deprivation Clause claim, which requires only "state involvement," against the Fourteenth Amendment requires the plaintiff to satisfy the classic "state action" test, but even if it does, we find that Ms. Lesley has alleged enough factual matter to survive a motion to dismiss.

To allege state action under the Fourteenth Amendment, the Supreme Court has said that the conduct alleged must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 937 (1982). This requires first for the discrimination to be "caused by" the State in some way or ascribed to a governmental decision. *Lugar*, 457 U.S. at 937. Second, the party charged must "fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Id.* "In other words, plaintiff must demonstrate that there was a significant nexus between the actions of the state and the allegedly discriminatory decision [of the private defendant]." *Phelps*, 886 F.2d at 1271. Ms. Lesley's claims satisfy the first requirement easily, in that she was harassed and fired by the Commission, which she alleges was done with the help of the Bennetts. ECF No. 43 at 38. The second is more difficult. Ms. Lesley alleges that "Board Members met frequently and plotted with the Bennetts to challenge and censor disfavored books and to pressure Ms. Lesley," *id*. at 37; "[Board Member] Bear regularly spoke with and collaborated efforts with Defendants," *id.* at 35; and "Defendants had colluded with Commissioner Reardon and other Commissioners to ambush Ms. Lesley at this meeting," *id.* at 10.

24

In *Phelps*, the Tenth Circuit held that the fact-intensive inquiry into state action required further development of the factual record: "the precise nature of the state's involvement… is critical to a determination of whether there was state action involved in the discriminatory conduct." *Phelps*, 886 F.2d at 1271. Similarly, a more full-fledged assessment of whether the Bennetts can be considered state actors, determined by how closely they "acted together," would require further discovery. For this reason, we hold that Ms. Lesley has alleged sufficient collaboration between the State and Defendants to state a valid claim for relief, and we decline to rule on the matter at this stage of the proceedings.

> b.  Clause Two: Hinderance

Ms. Lesley also asserts her claim for relief under a separate section of § 1985(3): the hinderance clause. The clause states:

> If two or more persons in any State or Territory conspire… for the purpose
> of preventing or hindering the constituted authorities of any State or Territory
> from giving or securing to all persons within such State or Territory the equal
> protection of the laws… the party so injured or deprived may have an action
> for the recovery damages…

Section 1985(3). Ms. Lesley is contending that Defendants conspired to hinder *her*, as a state officer, from "securing to all persons… the equal protection of the laws." "Plaintiff is a constituted authority, authorized to carry out official job duties on behalf of Campbell County… Defendants ceaselessly harassed, interfered with, and hampered the performance of official job duties." ECF No. 45 at 21. Ms. Lesley alleges that Defendants goal was "to remove books from the library containing LGBTQ+ content or voices in violation of the rights guaranteed by the Constitution." ECF No. 43 at 41. As referred to

in other parts of the complaint, Ms. Lesley is, at a minimum, referring to violations of the First and Fourteenth Amendments. *See id*. at 33-35.

Some of the same elements apply to this clause as well – the basic conspiracy requirements, for instance, and probably the class-based animus restriction, based on the dicta in *Bray*. 506 U.S. 263 at 281 ("a cause of action under the "hindrance" clause would seem to require the same 'class-based, invidiously discriminatory animus' that the 'deprivation' clause requires"). We incorporate the analyses on those topics from the previous section here.

Defendants contend that Ms. Lesley's claim under this clause presents two primary issues. The first is that the hindrance clause was intended only to cover law enforcement. ECF No. 48 at 7. We disagree. Defendants have cited, as an authority, a district court in the Second Circuit that states "the purpose of the conspiracy must be to interfere with state law enforcement." *Kochan v. Kowalski*, 431 F. Supp. 3d 130, 139 (W.D.N.Y. 2019). This case cites another district court, which in turn directs us to a Ninth Circuit opinion, *National Abortions Federation v. Operation Rescue*. In that case, the court was considering whether protestors that had overwhelmed police presence constituted a conspiracy to hinder the "constituted authorities." 8 F.3d 680, 685 (9th Cir. 1993). It held specifically that the conspiracy had to be aimed both at interfering with those authorities, as well as at interfering with the legal rights of the individuals. *Id.*

In other words, the purpose of this distinction was not to say that only law enforcement officers are "constituted authorities," but rather to distinguish the fact that hindrance-clause conspiracies must have two *aims*: interfering with an individual's legal

rights *and* interfering with authorities, whoever they are. *Id.* ("First, the purpose must be to interfere with state law enforcement, not just to interfere with the persons seeking to exercise their legal rights. Thus, where the *effect* of a demonstration… interferes with someone's rights, this would not be actionable unless that was the *purpose* of the conspiracy"). In both *Kochan* and *Operation Rescue*, the plaintiffs already alleged that defendants hindered law enforcement. The courts in these cases were not specifying that the involvement of law enforcement was necessary; they were clarifying the requirements of the aims of a Section 1985(3) conspiracy, and the relevant authorities in each case happened to be law enforcement officers. None of these cases actually state that the only possible "authorities" are law enforcement.

What makes further analysis difficult, however, is that we can uncover only very few cases in which a hindrance claim involved any state authority other than police. In 1981, the Eastern District of New York held that defendants violated the hindrance clause by thwarting the New York State Office of Mental Retardation and Developmental Disabilities' attempt to purchase a building to house disabled individuals. *People of State of N.Y. v. 11 Cornwell Co.*, 508 F. Supp. 273, 276 (E.D.N.Y. 1981), vacated on other grounds, 718 F.2d 22 (2d Cir. 1983) (discussing attorney's fees). In 2004, the District Court for the Eastern District of Pennsylvania upheld a complaint in which "Plaintiffs aver that defendants' conspiracy interfered with plaintiffs' ability to obtain building permits from state agencies*." Abdulhay v. Bethlehem Med. Arts, L.P.,* No. CIV.A. 03-CV-04347, 2004 WL 620127, at *9 n.41 (E.D. Pa. Mar. 29, 2004).

Ms. Lesley's allegations are not dissimilar from these two situations. She alleges that as a librarian, she "is a constituted authority, authorized to carry out official job duties on behalf of Campbell County," seemingly much like a state agency is tasked with housing the disabled or with adjudicating permits. ECF No. 45 at 21. She alleges that Defendants "ceaselessly harassed, interfered with, and hampered" her job performance with the ultimate goal "to remove books from the library containing LGBTQ+ content or voices in violation of the rights guaranteed by the Constitution." ECF No. 43 at 21, 41. Because Defendants do not present any authority that genuinely holds that Section 1985(3) requires "constituted authorities" to be law enforcement officers, and other courts have upheld allegations against other state authorities under the Hindrance Claim, we see no reason to limit the clause's construction.

Defendants' second argument is that claims under the Hindrance Clause, like the Deprivation Clause, are limited to conspiracies aimed at interfering with rights protected against *private* encroachment. Again, we are left without much guidance. In *Scott,* the Court held that "an alleged conspiracy to infringe First Amendment rights is not a violation of § 1985(3) unless it is proved that the state is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the state." *Scott*, 463 U.S. at 830. However, the plaintiffs in *Scott* were only addressing a deprivation claim. While there is some debate on the issue in *Bray*, the majority only conclusively established that the issue was not properly presented to them. *Bray*, 506 U.S. at 279-84. The First Circuit, writing after *Bray*, analyzed the issue at length and determined that

28

the same constitutional and policy concerns [of the deprivation clause] are not triggered. The hindrance clause, unlike the deprivation clause, implicates the *ability* of the State to ensure and safeguard rights protected against any infringement… When the State's conduct is thus arrogated, state action is clearly implicated, and rights protected only against official infringement are likewise implicated…. We therefore hold that claims brought under the hindrance clause of § 1985(3) do not require that the right allegedly infringed be one guaranteed against private encroachment.

*Libertad v. Welch*, 53 F.3d 428, 450 (1st Cir. 1995).

We tend to agree: a conspiracy with the purpose of curtailing state activity necessarily implicates the state. Defendants' undisputed goal in this matter was to push state actors to remove books from the library based on their content, arguably in violation of the First Amendment. State action was the explicit goal, and it seems that it was achieved. In any case, Ms. Lesley's implied state-action/state-involvement contention mentioned in our Deprivation Claim discussion also applies here. At a minimum, further development of the factual record is needed to understand whether the Bennetts were acting with sufficient involvement of the state, and thus we must deny this motion to dismiss.

## III.    Civil Conspiracy Claim

Both Defendants and Plaintiff agree that, to survive a motion to dismiss, Plaintiff must plead facts showing "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate cause thereof." *White v. Shane Edeburn Const., LLC,* 285 P.3d 949, 958 (Wyo. 2012). Much of this has been discussed above, and Defendants only contest prong four here: that plaintiff has not alleged that Defendants

committed a tort. ECF No. 44. Plaintiff has alleged multiple torts in her complaint, including intentional infliction of emotional distress, and therefore we see no reason to dismiss the claim on that basis. ECF No. 43 at 43.

## IV.     Injurious Falsehoods Claim

We must dismiss Plaintiff's injurious falsehood claim because she has provided no basis under Wyoming law for recognizing the claim. Wyoming courts have stated that "The particular form of injurious falsehood that involves disparagement of the property in land, chattels, or intangible things, is commonly called 'slander of title.'" *Bennett v. Pace*, 731 P.2d 33, 35 (Wyo. 1987) (quoting Restatement, Second, Torts § 624, comment a at 343)."[6] Plaintiff clarifies, however, that her claim for relief is not based on this "particular form" of injurious falsehood, but rather some other category that this quote suggests but on which Wyoming courts have never elaborated.

Instead, Plaintiff references to injurious falsehoods in the common law of Utah and "commercial disparagement" in Colorado. For the former, the defendant must make some statement that causes "disparagement or depreciation of the quality of the plaintiff's product…. It is a business tort." *Shanley v. Hutchings*, 716 F. Supp. 3d 1179, 1199 (D. Utah 2024).  In Colorado, the state law requires, *inter alia,* that the defendant make a statement "derogatory to the plaintiff's business." *Examination Bd. of Pro. Home Inspectors v. Int'l Ass'n of Certified Home Inspectors*, 519 F. Supp. 3d 893, 918 (D. Colo.

---

[6] Defendants further contend that the claim of slander of title requires plaintiffs to plead a disposable interest in land, which Plaintiff has not done. The case clearly states otherwise - "any kind of legally protected interest" in any type of property is required. *Pace*, 731 P.2d at 35.

2021), aff'd sub nom. *Am. Soc'y of Home Inspectors, Inc. v. Int'l Ass'n of Certified Home Inspectors*, 36 F.4th 1238 (10th Cir. 2022).

We see no basis in Wyoming law to incorporate these distinct torts, which Wyoming courts have never acknowledged. In addition, all of the cases mentioned, and the tort seems to require, an independent business interest. Plaintiff mentions no such interest. We therefore dismiss this claim.

## V.    Intentional Infliction of Emotional Distress

A claim of intentional infliction of emotional distress must indicate that the defendant, "by extreme and outrageous conduct[,] intentionally or recklessly causes severe emotional distress" to the plaintiff. *Hoblyn v. Johnson*, 55 P.3d 1219, 1231 (Wyo. 2002). To take a quote from each of the parties' briefs, extreme and outrageous conduct is conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Larsen v. Banner Health Sys.*, 2003 WY 167 (wyo. 2003). It is also where the "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Hatch v. State Farm Fire & Cas. Co.*, 930 P.2d 382, 396 (Wyo. 1997).

Wyoming courts have recognized all sorts of behavior as outrageous enough to satisfy this standard. In *Worley,* the Wyoming Supreme Court held that in a case where an employee had a stellar work record, but where his employer repeatedly threatened to terminate his employment, made impossible demands, and vilified him for minor infractions was sufficient to withstand the summary judgment. *Worley v. Wyoming Bottling Co.*, 1 P.3d 615, 629-630 (Wyo. 2000). In *Wilder*, the court reached a similar

31

conclusion when the employer sought to publicly humiliate an employee by making him apologize for something he did not do to a community group. *Wilder v. Cody Country Chamber of Com.*, 868 P.2d 211, 223 (Wyo. 1994). By contrast, in *Hatch*, the Wyoming Supreme Court found that it was *not* sufficiently outrageous that an insurance company investigating plaintiff's house fire delayed plaintiffs from returning to their home, showed up unannounced, and made them fill out extremely lengthy paperwork. *Hatch*, 930 P.2d at 396.

We find that Ms. Lesley's situation is more similar to the first two examples than to the latter. While the Defendants were not Ms. Lesley's employers, they allegedly conspired with her employers to humiliate her by displaying billboards in town claiming that the library she directed indoctrinated children, tried to convince other members of the community that she was encouraging children to have sex, wrote articles saying she exposed children to pornography, made numerous comments at public meetings that she was committing crimes, reported her to the police and threatened "charges" at another public meeting, and regularly called for her resignation, all to pressure her into removing library books, which she was not allowed to do by law. ECF No. 43 at 20, 21, 26, 28. After the police told Defendants that there were no grounds for criminal charges, Defendants continued to claim at public meetings that Ms. Lesley was distributing obscene materials, and that she was "fighting a losing battle and the longer you resist, the worse it's gonna be." *Id*. at 32. She was eventually fired for not removing books from the library. *Id.* at 38. We find that such behavior could reasonably be considered outrageous, and similar behavior – making impossible demands and public humiliation in a

32

professional context – has been recognized as outrageous by Wyoming courts. *See Wilder*, 868 P.2d at 223; *Worley*, 1 P.3d at 629-630.

Defendants argue that Ms. Lesley must prove that they acted with "actual malice" in these actions because, as a librarian, she was a public figure. ECF No. 44 at 21 (citing *Spence v. Flynt*, 816 P.2d 771,774 (Wyo. 1991). We are not convinced. Defendants define "public figure" in its discussion of the injurious falsehood claim using half of a quote, but the entire quote is more instructive. A plaintiff must plead actual malice in a defamation claim against a government official only when:

> a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, *beyond the general public interest in the qualifications and performance of all government employees.*

*Hill v. Stubson*, 2018 WY 70, ¶ 13, 420 P.3d 732, 739 (Wyo. 2018) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966) (emphasis added). The individual discussed in that case was an elected state legislator. Defendants do not offer an argument about why a county librarian has "such apparent importance" that the public (other than, apparently, the Bennetts themselves) has more of an interest in their qualifications than it would in any other government employee. We find no reason to create an argument for them, and therefore will not require actual malice to be pled at this stage.

Wyoming courts have also required a showing of the impact of the stress. *See Hoblyn*, 55 P.3d at 1231. Some of that impact is obvious: Ms. Lesley was fired. Mere termination, however, is not enough to prove emotional damages. *See Worley v. Wyoming Bottling Co.*, 1 P.3d 615, 628 (Wyo. 2000). Plaintiff's evidence on this point is sparse:

she states that the Defendants' and the Commissioners' harassment made her life was "a living hell" for two years. Defendants contend that the actual phrase (according to the video, which they attach) was "For twenty-five years, this was my dream job. The last two years have been pure hell." ECF No. 44 at 5-6. She also states that she was "worried and losing sleep and exhibiting other physical symptoms of anxiety and stress due to the report to the police and the constant harassment by Defendants and their followers." ECF No. 43 at 30. This surpasses the requirements for a motion to dismiss, but just barely. To sustain this claim Plaintiff will need to provide more evidence of the impact of her emotional distress on her life.

## VI.    Abuse of Process

The elements of abuse of process are "first, an ulterior purpose, and second, a willful action the use of the process not proper in the regular conduct of the proceeding." *Toltec Watershed Imp. Dist. v. Johnston*, 717 P.2d 808, 811 (Wyo. 1986). Furthermore, "there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant." *Id.* To be considered abuse, the process must be used "primarily for an immediate purpose other than the purpose designed and intended." *Id.* (citing *Bosler v. Shuck,* 714 P.2d 1231 (Wyo., 1986). Plaintiff and Defendants, through the briefs, discuss various technical points regarding abuse of process claims. However, we need not discuss all of them because the dispute can be resolved over a more fundamental matter: the process was not misused.

All parties agree that Defendants filed a complaint against Ms. Lesley with the Campbell County Sheriff's Office, formally accusing her of disseminating obscene material to children at the library and listing five "offensive" books that could be found in the library. ECF No. 43 at 26. It is also undisputed that, after the County Attorney wrote a memo on the matter, the complaint was dismissed, and criminal charges were never filed. See ECF No. 44 at 23.

Per the facts alleged in the complaint, Defendants do not appear to have actually lied to law enforcement or misused the process in any way. They merely filed a complaint based on the incorrect legal conclusion that books teaching children about the human body constitute "hard-core pornography." ECF No. 43 at 26. It is true that the Bennetts continued to publicly accuse Ms. Lesley of committing crimes (*see id.* at 27), but those statements did not involve any further use of the legal process. The cases that Plaintiff cites all involve actual false statements made to officers or further arrests. *See, e.g., Pitts v. City of Cuba,* 913 F. Supp. 2d 688, 716 (E.D. Mo. 2012); *McGlory v. Bohlender*, No. Civ. A. 93-2206-EEO, 1994 WL 326022, at *2 (D. Kan. June 15, 1994); *Jones v. Slay*, 61 F. Supp. 3d. 806, 836 (E.D. Mo. 2014).

## CONCLUSION

This Court finds that Plaintiff has plead sufficient factual material to support her Section 1985(3) claim, her civil conspiracy claim, and her intentional infliction of emotional distress claim. **IT IS HEREBY ORDERED** that Defendants' *Motion to Dismiss* (ECF No. 44) is **DENIED** on those claims. However, Plaintiff's Section 1985(1) claim and her claims of abuse of process and injurious falsehoods do not state plausible

claims for relief. Therefore, **IT IS HEREBY ORDERED** that Defendants' *Motion to Dismiss* is **GRANTED** regarding those claims.

Dated this ___10___<sup>th</sup> day of April, 2025.


Alan B. Johnson
United States District Judge